[No. F056965. Fifth Dist. July 13, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY WILSON, Defendant and Appellant.

794

---

COUNSEL

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Julie A. Hokans, Deputy Attorney General, for Plaintiff and Respondent.

**O**PINION

**POOCHIGIAN, J.—**

## INTRODUCTION

Appellant/defendant Anthony Wilson, a prisoner at California Correctional Institution, Tehachapi, declared to Correctional Officer Bryan Thornberry that he could find anyone and "blast" them, he had killed officers, he had done it before and he would do it again, and he would find Thornberry and "blast" him when he was released on parole in 10 months. After a jury trial, defendant was convicted of count I, criminal threats (Pen. Code,[1] § 422), and count II, threats to the staff of an exempt employee of the Governor (§ 76, subd. (a)(1)), and the jury found true the special allegations that he had four prior strike convictions (§ 667, subds. (c)–(j)) and served four prior prison terms (§ 667.5, subd. (b)). He was sentenced to third strike terms of 25 years to life for both counts I and II, plus four years for the prior prison term enhancements (§ 667.5, subd. (b)). The court stayed the term imposed for count II pursuant to section 654.

On appeal, defendant contends both convictions are not supported by substantial evidence, and the court committed instructional error as to the elements of section 76. We will find defendant's conviction for making criminal threats against Thornberry is supported by substantial evidence because the nature and circumstances of the threat showed that it was "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (§ 422.) We will also find defendant's conviction for violating section 76 is supported by substantial evidence as Officer Thornberry is in the class of persons covered by that section.

## FACTS

On August 23, 2007, Correctional Officer Gilbert Ybarra was working as a control booth officer in a maximum security area of the Tehachapi prison. The inmates in that unit were primarily from the prison's secure housing unit (SHU) or administrative segregation unit.

During the afternoon, Ybarra announced that the inmates should get ready to take showers. He remotely opened the cell doors one at a time to give each inmate an opportunity to walk to the showers. Ybarra opened defendant's cell

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

door but he did not step out, so Ybarra closed the door and moved on to the next cell. A moment later, another inmate told Ybarra that defendant wanted to shower.

Ybarra finished opening the cell doors for the other inmates and then returned to defendant's door and opened it. Defendant was agitated when he walked out. Ybarra asked defendant if he wanted to take a shower. Defendant said, "F--- no, I already took one." Ybarra testified that defendant "stepped out of his cell and pulled out his penis, his erect penis, and said, 'Shower this, you bitch ass motherf-----.' " Defendant went back into his cell and Ybarra closed the door. Ybarra did not know how long defendant had been on that tier and had not had any prior interactions with him.

About 10 or 15 minutes later, Ybarra reported the incident to Correctional Officers Joseph McIrvin and Bryan Thornberry, who were the floor officers on duty. McIrvin and Thornberry decided to speak to defendant about the incident. Ybarra opened defendant's cell door and told him to go to the floor level office, and defendant complied. Ybarra remained in the control booth. Ybarra later heard defendant yelling, and watched McIrvin and Thornberry lead defendant out of the building in restraints.

*Defendant's statements in the office*

Correctional Officers McIrvin and Thornberry testified about what happened when defendant entered the floor office. McIrvin had been on the job for seven years and had never known an inmate to expose himself to a male officer. McIrvin thought defendant's behavior was bizarre and asked him what was wrong. Defendant said he did not have a problem. McIrvin described him as agitated, "[k]ind of like with a chip on his shoulder" and his voice was "kind of snappy and loud." McIrvin advised defendant, " '[T]he control officer informed me that you exposed yourself in a sexual manner.' " Defendant became "really mad" and said, " 'F--- you, motherf-----. If he saw it, he must have liked it.' " McIrvin testified defendant's voice was raised and he was "pretty upset."

Thornberry testified that when McIrvin asked defendant what was going on, defendant "immediately began saying that, well, you know, what are you guys going to do, you know, kick my ass?" Both officers said that was not what they were there for, and they were just trying to find out what was going on. Thornberry testified defendant became more "agitated and elevated" and repeatedly said, "Are you going to kick my ass? Are you—you going to go ahead and f--- me up. I've had my ass beat before." Thornberry described defendant's behavior: "He was becoming very loud, you know, yelling, and you could just see with his body language that he was, you know, very antsy

and not really staying—standing still, as if you were to have a normal conversation. He was—you could tell not only by his body language but his elevated—you know, his yelling, and then his language and the comments that he was making."

Both McIrvin and Thornberry concluded they could not calm down defendant because he was very upset. McIrvin feared the situation might escalate and become unsafe because of defendant's conduct. The officers told defendant to turn around to be handcuffed. Defendant complied and Thornberry handcuffed defendant's arms behind his back.

*Defendant's statements in the exercise yard*

McIrvin and Thornberry decided to escort defendant from the cell building to "clinic hold," which is "kind of a cooling-off place," a set of holding cells at the medical clinic where disruptive inmates are placed "so they don't agitate the other inmates or disrupt the normal operation of the housing units." They had to walk about 100 to 150 yards across an open exercise yard to reach the clinic. McIrvin and Thornberry flanked defendant and each grasped an elbow while defendant's hands were cuffed behind his back, and their batons were out.

McIrvin testified that after defendant was restrained and while he was still in the office, defendant acted "very belligerent" and "starting saying a lot of things." McIrvin testified: "[Defendant] was asking if we were going to beat him up, and that if we were going to, we better do it while he's in handcuffs. [¶] *He started talking about killing officers, claiming that he had done it before.* [¶] Just being very loud and belligerent." (Italics added.)

Thornberry also testified that once defendant was placed in handcuffs, defendant asked if they were going to beat his ass. Thornberry told defendant no—that was not what they were there for. Thornberry testified defendant made additional statements as they walked out of the cell building. "And [defendant] said, '*I'll* [sic] *do it before and I'll do it again*,' which to me meant that he was going to either plan—you know, was planning an assault or—you know, I didn't really understand at that point, but I took it . . . as a—some sort of a threat, you know." (Italics added.)

McIrvin testified that as they escorted defendant across the yard, defendant "just kept asking if we were going to beat him up, and that . . . he had been beat up by officers before, you know, that he wasn't scared of that." McIrvin told defendant they were not going to beat him up, and they were taking him to "clinic holding" so he could tell the sergeants about his problem. McIrvin testified defendant became "pretty animated" and his voice was very loud and

angry. Defendant was "looking around and being very, very, very tense, kind of puffed up." McIrvin directed him to "be quiet and face forward" as they continued across the open yard.

McIrvin testified that as they approached the clinic holding area, they had to walk up a steady incline in the yard, which contained a helipad. At that point, defendant "looked over to Thornberry and told him, '*I can find anybody and blast them. That's what I do.*' " (Italics added.)

Thornberry also testified that as they walked up the helipad area, defendant turned and looked him right in his eyes and said: "*I get out in ten months. I find people. That's what I do, and I'm going to find you, and I'm going to blast you.*" (Italics added.) Thornberry testified he was in shock from defendant's statement: "I've never had anybody say that they're getting out in ten months, and so it was just—I guess fear."

*Defendant's statements in the clinic holding area*

When Thornberry and McIrvin reached the clinic holding area with defendant, McIrvin searched the cell for contraband while Thornberry kept his hands on defendant's arms. They placed defendant in the cell. Thornberry directed defendant to back up and place his hands in the port, and Thornberry removed the handcuffs. The officers instructed defendant to strip for an unclothed body search. Thornberry testified that defendant "gave a deep breath" and "[r]eluctantly" complied, and handed his clothes and underwear through the port. The officers searched his clothes and conducted a visual check of defendant's body for contraband, but did not conduct a body cavity search. The searches were negative, and they gave defendant his boxers and T-shirt through the port.

McIrvin testified that defendant put on his underwear, and Thornberry placed the rest of defendant's clothes in the port and locked the cell. McIrvin testified that defendant put up his hands like guns, pointed his hands at Thornberry, and said, "*I'm going [to] blast you.*" (Italics added.) As defendant made the statement, he raised his hands in the air, his fists were clenched, his index fingers pointed away from his body, and his thumbs were raised in the air. McIrvin testified defendant looked right at Thornberry when he made the statement and the gesture. McIrvin testified defendant's voice "wasn't as loud as or [angry] as earlier, you know, but it was—you know, he told him."

Thornberry testified to the same scene that McIrvin heard and observed in the clinic holding area. Thornberry was standing in front of the cell and he was just about to walk away when he heard defendant say something to him: "[Defendant] said, '*Remember, Thornberry,*' and then he held up both of

his hands like this, and said, '*I'm going to blast you.*' " (Italics added.) Thornberry demonstrated that defendant raised both fists in the air with his index finger pointed out, and then curved in the index finger. Defendant looked right at Thornberry as he made the statements and gesture. Defendant's voice was loud but he was not yelling.

Thornberry testified he felt "immediate fear." He had been threatened by an inmate once in seven years, and that inmate only threatened to fight him. Thornberry testified defendant's statement and gesture made him pause and wonder why defendant would say that, because defendant had only been in the cell unit for about a week and they had not had any prior interactions. "Well, I had never had anyone tell me that they—when they were getting out, you know, and the specific threat to come find me because that's what they do, and to blast me. [¶] So, you know, I take that—I have a family, kids, and I take that very serious."

Thornberry immediately reported the incident to his supervisor and prepared a report. A few hours later, the sergeant informed him that defendant was, in fact, set to be paroled in 10 months. Thornberry testified about the impact of this information: "[N]ow that it was confirmed what he said that he was getting out, it just basically confirmed my fear that this guy is serious about what he's talking about. [¶] And that his . . . anger during the time that we were trying to talk to him was so intense that he would, indeed, carry it out."

Thornberry testified that defendant never threatened to use force against him that day. However, Thornberry interpreted defendant's statements to mean that he would do so when he got out, "[t]hat was his direct statement," and Thornberry was satisfied that it would occur in 10 months.

The trial court took judicial notice that defendant's Department of Corrections and Rehabilitation (CDCR) file showed a parole release date of July 7, 2008. The court also took judicial notice that the complaint in this case was filed on June 11, 2008. It does not appear that defendant was actually released from custody. The probation report states that he was transported to Kern County jail and booked in on the current charges on July 7, 2008, and all the court's pretrial minute orders state that he was in custody when he appeared, and he was remanded to the custody of the CDCR or the sheriff at the end of the proceedings.

*Defendant's testimony*

Defendant testified at trial and admitted he had prior convictions for second degree burglary in April 1983 (§ 459), attempted first degree burglary

in May 1984, receiving stolen property in August 1984 (§ 496), first degree burglary in February 1986, first degree burglary in October 1988, committing "terrorist threats" in October 2002 (§ 422), and evading police officers with disregard for their safety in November 2004 (Veh. Code, § 2800.2, subd. (a)).

Defendant testified he never exposed himself to or threatened any officers, and offered a lengthy narrative in which he claimed that Officers Ybarra, Thornberry, and McIrvin harassed him for no particular reason. Defendant claimed Thornberry and McIrvin raised their batons at him, McIrvin repeatedly called him a coward and challenged him to a fight, McIrvin was going to hit him, and Thornberry stopped McIrvin from doing so. Defendant testified that in the course of these exchanges, he told the officers that he had previously been at Pelican Bay State Prison for assaulting staff, but he was younger then and he was not looking for trouble anymore because he was getting out in 10 months. Defendant also testified that he only raised his hands when he was in the clinic holding cell, to show his exasperation with Thornberry and McIrvin because they were talking to him at the same time.

Defendant admitted he had a prior conviction for assaulting a correctional officer but denied that particular assault actually occurred. Defendant claimed the officer hurt himself when, in the process of restraining defendant, he unnecessarily decided to bring defendant forcibly down to the ground.

*Rebuttal*

McIrvin and Thornberry testified they did not draw or raise their batons when they spoke to defendant in the office, but they followed standard procedures and removed their batons as they escorted him across the exercise yard. Neither McIrvin nor Thornberry heard defendant say he had been at Pelican Bay State Prison for assaulting an officer.

## DISCUSSION

I. *Defendant's conviction for violating section 422 is supported by substantial evidence.*

Defendant contends the evidence in support of his conviction for making criminal threats against Officer Thornberry is insufficient as a matter of law because his alleged threat to "blast" him, along with the surrounding circumstances, did not convey "a gravity of purpose and immediate prospect of execution to . . . the alleged victim," as required by section 422, since defendant was in custody and under the complete control of law enforcement officers when he made the statements.

We will review the historical basis for the current version of section 422, particularly the statutory requirement that the threat must be "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." We will also review cases involving conditional threats and threats made by defendants who were in custodial situations and conclude there is substantial evidence to support defendant's conviction in this case.

### A. Section 422 and constitutionally protected speech

One of the most important questions in this case is the meaning of section 422's requirement that the threat must be "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." The question is whether this language limits the timespan under which the speaker intends to execute the threat. The historical background of section 422 reveals that this language was added to the statute to ensure that a person was not punished for constitutionally protected speech.

"As originally enacted, section 422 made it a felony to 'willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with intent to terrorize another or with reckless disregard of the risk of terrorizing another,' if such threats cause another person 'reasonably to be in sustained fear for his or her[] or their immediate family's safety.' To 'terrorize' was defined by section 422.5 as ' "creat[ing] a climate of fear and intimidation by means of threats or violent action causing sustained fear for personal safety *in order to achieve social or political goals.*" ' [Citation.] Thus, read together, the two statutes penalized only threats made with intent to achieve 'social or political goals.' [Citation.]" (*In re Ge M.* (1991) 226 Cal.App.3d 1519, 1522 [277 Cal.Rptr. 554].)

In 1981, the California Supreme Court found then sections 422 and 422.5 were unconstitutional because the phrase "social or political goals" was void for vagueness. (*People v. Mirmirani* (1981) 30 Cal.3d 375, 383, 388 [178 Cal.Rptr. 792, 636 P.2d 1130] (*Mirmirani*).) Since the crime defined by the two statutes could be committed by words alone, the statutes were subject to the "strict standards" required by the First Amendment to evaluate a vagueness challenge. (*Mirmirani,* at p. 383.) *Mirmirani* concluded that the phrase " 'social or political goals' " had "no established legal meaning," the statutes did not provide clear lines "by which citizens, law enforcement officials, judges and juries can understand what is prohibited and what is not," and it was "virtually impossible to determine what conduct by an individual in a democratic society could not in some way be construed as an attempt to achieve a 'social' or 'political' goal." (*Id.* at p. 384.)

*Mirmirani* acknowledged the Legislature may constitutionally penalize threats, "even though they are pure speech," but statutes which attempt to do so "must be narrowly directed only to threats which truly pose a danger to society," and cited to a series of federal courts of appeals and United States Supreme Court opinions on this point, including *Watts v. United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399] (*Watts*) and *U.S. v. Kelner* (2d Cir. 1976) 534 F.2d 1020 (*Kelner*). (*Mirmirani, supra,* 30 Cal.3d at p. 388, fn. 10.) *Mirmirani* specifically noted *Kelner*'s holding that "a threat can be penalized only if 'on its face and in the circumstances in which it is made [it] is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . .' " (*Mirmirani, supra,* 30 Cal.3d at p. 388, quoting *Kelner, supra,* 534 F.2d at p. 1027.)

Sections 422 and 422.5 were repealed in 1987. (*In re Ge M., supra,* 226 Cal.App.3d at p. 1522.) In 1988, section 422 was amended and reenacted to prohibit "criminal" rather than "terrorist" threats. (*In re Ge M.,* at p. 1522; see *People v. Moore* (2004) 118 Cal.App.4th 74, 78–79 [12 Cal.Rptr.3d 649].) Section 422 now states: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is *so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,* and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (Italics added.)

The California Supreme Court has extensively described the origins of the statutory phrase italicized *ante,* which the Legislature added to section 422 to ensure the amended statute would pass muster under the First Amendment and not suffer the same constitutional fate as its predecessor.

"The Legislature . . . enacted a substantially revised version [of section 422] in 1988, adopting almost verbatim language from *United States* v. *Kelner*[, *supra,*] 534 F.2d 1020. [Citations.] In *Kelner,* the defendant, a member of the Jewish Defense League, had been convicted under a federal statute for threatening to assassinate Palestinian leader Yasser Arafat, who was to be in New York for a meeting at the United Nations. Kelner argued that without proof he specifically intended to carry out the threat, his

statement was political hyperbole protected by the First Amendment rather than a punishable true threat. (*United States* v. *Kelner, supra,* 534 F.2d at p. 1025.)

"The reviewing court disagreed and concluded threats are punishable consonant with constitutional protections 'when the following criteria are satisfied. So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied.' (*United States* v. *Kelner, supra,* 534 F.2d at p. 1027.) In formulating this rationale, the *Kelner* court drew on the analysis in *Watts* v. *United States*[, *supra,*] 394 U.S. 705 . . . , in which the United States Supreme Court reversed a conviction for threatening the President of the United States. Defendant Watts had stated, in a small discussion group during a political rally, ' "And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." ' (*Id.* at p. 706.) Both Watts and the crowd laughed after the statement was made. (*Id.* at p. 707 . . . .) The Supreme Court determined that taken in context, and considering the conditional nature of the threat and the reaction of the listeners, the only possible conclusion was that the statement was not a punishable true threat, but *political hyperbole privileged under the First Amendment.* (*Id.* at pp. 707–708 . . . .)

"As the *Kelner* court understood this analysis, the Supreme Court was not adopting a bright line test based on the use of conditional language but simply illustrating *the general principle that punishable true threats must express an intention of being carried out.* (See *United States* v. *Kelner, supra,* 534 F.2d at p. 1026.) 'In effect, the Court was stating that *threats punishable consistently with the First Amendment were only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected [attacks on government and political officials].*' (*Ibid.*) Accordingly, '[t]he purpose and effect of the *Watts* constitutionally-limited definition of the term "threat" is to insure that *only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished—only such threats, in short, as are of the same nature as those threats which are . . . "properly punished every day under statutes prohibiting extortion, blackmail and assault . . . ."* ' (*Id.* at p. 1027.)" (*People v. Bolin* (1998) 18 Cal.4th 297, 338–339 [75 Cal.Rptr.2d 412, 956 P.2d 374], italics added (*Bolin*).)[2]

---

[2] The standard set forth in *Kelner* is still used by some federal courts to determine whether a statement qualifies as a threat for First Amendment purposes. (See, e.g., *New York ex rel.*

This historical background suggests the inclusion of the language in the current statute—that the threat must be "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"—was not intended to impose a specific time limitation upon the speaker's intent to execute the threat, but instead to avoid First Amendment challenges and not criminalize constitutionally protected speech.

■ The current version of section 422 "has been carefully drafted to comport with the detailed guidelines articulated by the *Kelner* court" and is not constitutionally overbroad. (*People v. Fisher* (1993) 12 Cal.App.4th 1556, 1560 [15 Cal.Rptr.2d 889]; see *In re David L.* (1991) 234 Cal.App.3d 1655, 1661 [286 Cal.Rptr. 398] (*David L.*).) "[T]he standard set forth in [the current version of] section 422 is *both the statutory definition of a crime and the constitutional standard for distinguishing between punishable threats and protected speech.* Accordingly, in applying section 422, courts must be cautious to ensure that the statutory standard is not expanded beyond that which is constitutionally permissible. [Citation.]" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861–862 [123 Cal.Rptr.2d 193], italics added (*Ryan D.*).)

Thus, section 422 cannot be applied to constitutionally protected speech. (*Ryan D., supra,* 100 Cal.App.4th at p. 861.) " 'When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection.' " (*People v. Toledo* (2001) 26 Cal.4th 221, 233 [109 Cal.Rptr.2d 315, 26 P.3d 1051], italics omitted (*Toledo*), quoting *In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365].) In drafting the current version of section 422, "the Legislature limited the punishment for criminal threats to this type of unprotected speech. [Citation.]" (*People v. Jackson* (2009) 178 Cal.App.4th 590, 598 [100 Cal.Rptr.3d 539].)

There are still First Amendment concerns that may be implicated by a prosecution under section 422, however, and those concerns affect the standard of appellate review of a conviction under that statute. When a defendant raises a plausible First Amendment defense in a section 422 case, the reviewing court should make an independent examination of the record to ensure that a speaker's free speech rights have not been infringed by the trier of fact's determination that the communication at issue constitutes a criminal threat. (*In re George T.* (2004) 33 Cal.4th 620, 632–634 [16 Cal.Rptr.3d 61, 93 P.3d 1007] (*George T.*).)

*Spitzer v. Operation Rescue National* (2d Cir. 2001) 273 F.3d 184, 196; *Freedman v. America Online* (D.Conn. 2005) 412 F.Supp.2d 174, 184.)

In this case, however, defendant has not raised any First Amendment arguments, and an independent standard of review is not applicable. When the First Amendment is not implicated, defendant's sufficiency of the evidence challenge is evaluated under the substantial evidence test. (Cf. *George T., supra,* 33 Cal.4th at p. 634; see, e.g., *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1136 [105 Cal.Rptr.2d 165] (*Ricky T.*); *People v. Mosley* (2007) 155 Cal.App.4th 313, 322 [65 Cal.Rptr.3d 856] (*Mosley*); *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1430 [115 Cal.Rptr.2d 924] (*Gaut*); *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1339 [69 Cal.Rptr.2d 728].) "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*Bolin, supra,* 18 Cal.4th at p. 331.)

B.   *Section 422 and conditional threats*

■   We now turn to the elements required to prove a violation of the current version of section 422. The California Supreme Court has construed section 422 to require the prosecution to prove five elements: "(1) [T]hat the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . *so unequivocal, unconditional, immediate, and specific* as to convey to the person threatened, a gravity of purpose and *an immediate prospect* of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*Toledo, supra,* 26 Cal.4th at pp. 227–228, italics added; see *George T., supra,* 33 Cal.4th at p. 630.)

■   Section 422 "was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others. [Citation.]" (*People v. Felix* (2001) 92 Cal.App.4th 905, 913 [112 Cal.Rptr.2d 311].) The statute "does not punish such things as 'mere angry utterances or ranting soliloquies, however violent.' [Citation.]" (*Ryan D., supra,* 100 Cal.App.4th at p. 861.) Instead, a criminal threat "is a specific and narrow class of communication," and "the expression of an intent to inflict serious evil upon another person. [Citation.]" (*Id.* at p. 863.)

"A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' [Citation.]" (*People v. Butler* (2000) 85 Cal.App.4th 745, 752 [102 Cal.Rptr.2d 269] (*Butler*).) In addition, section 422 does not require an intent to actually carry out the threatened crime. (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1220 [62 Cal.Rptr.2d 303].) Instead, the defendant must intend for the victim to receive and understand the threat, and the threat must be such that it would cause a reasonable person to fear for his or her safety or the safety of his or her immediate family. (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424 [4 Cal.Rptr.2d 519].) "While the statute does not require that the violator intend to cause death or serious bodily injury to the victim, not all serious injuries are suffered to the body. The knowing infliction of mental terror is equally deserving of moral condemnation." (*Ibid.*)

As explained in part I.A., *ante*, the third element required by section 422 was drafted by the Legislature to address First Amendment concerns, using the language from *Kelner* and *Watts*, requiring an "unconditional" threat. The California Supreme Court has explained that "[g]iven the rationale of *Kelner* and *Watts*, it becomes clear the reference to an 'unconditional' threat in section 422 is not absolute." (*Bolin, supra*, 18 Cal.4th at p. 339.) A prosecution "under section 422 *does not* require an unconditional threat of death or great bodily injury." (*Id.* at p. 338, italics added.) Section 422's use of the word "unconditional" from *Kelner* " 'was not meant to prohibit prosecution of all threats involving an "if" clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution.' [Citations.]" (*Bolin*, at p. 339.) " 'Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats.' " (*Ibid.*) " 'The use of the word "so" indicates that *unequivocality, unconditionality, immediacy and specificity are not absolutely mandated*, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.] 'If the fact that a threat is conditioned on something occurring renders it not a true threat, there would have been no need to include in the statement the word "so." ' [Citation.] This provision 'implies that there are different degrees of unconditionality. A threat which may appear conditional on its face can be unconditional under the circumstances. . . . [¶] Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of

execution.' [Citation.]" (*Bolin, supra*, 18 Cal.4th at p. 340.) Thus, the third element's four enumerated statutory elements—unequivocality, unconditionality, immediacy and specificity—are " 'simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim.' [Citation.]" (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538 [70 Cal.Rptr.2d 878] (*Melhado*).)

■ While the third element of section 422 also requires the threat to convey " 'a gravity of purpose and an immediate prospect of execution of the threat,' " it "does not require an immediate ability to carry out the threat. [Citation.]" (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679 [88 Cal.Rptr.2d 252]; see *People v. Smith* (2009) 178 Cal.App.4th 475, 480 [100 Cal.Rptr.3d 471].) "The 'immediate *prospect* of execution' in the context of a conditional threat is obviously to be distinguished from those cases dealing with threats of immediate harm, recognized at the very moment of the threat, such as those which support a defense of duress or necessity. [Citations.]" (*Melhado, supra*, 60 Cal.App.4th at p. 1538, fn. 6.) "How are we to understand the requirement that the prospect of execution be immediate, when, as we have seen, threats often have by their very nature some aspect of conditionality: A threat is made to convince the victim to do something 'or else.' . . . [W]e understand the word 'immediate' to mean that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out, should the conditions not be met." (*Melhado, supra*, 60 Cal.App.4th at p. 1538.)

■ "It is clear that the nature of the threat cannot be determined only at face value. Section 422 demands that the purported threat be examined 'on its face and under the circumstances in which it was made.' The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat," and such threats must be "judged in their context." (*Ricky T., supra*, 87 Cal.App.4th at p. 1137; see *People v. Martinez, supra*, 53 Cal.App.4th at p. 1218.) "[Section 422] does not concentrate on the precise words of the threat. Instead, the statute focuses on the effect of the threat on the victim, to wit, communication of a gravity of purpose and immediate prospect of execution of the threat. These impressions are as surely conveyed to a victim when the threatened harm is conditioned on an occurrence guaranteed to happen as when the threat is absolutely unconditional." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1158 [38 Cal.Rptr.2d 328], citing *People v. Brooks* (1994) 26 Cal.App.4th 142, 149 [31 Cal.Rptr.2d 283].)

■ "A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning. [Citation.]" (*George T., supra*, 33 Cal.4th at

p. 635.) In determining whether conditional, vague, or ambiguous language constitutes a violation of section 422, the trier of fact may consider "the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013 [109 Cal.Rptr.2d 464] (*Solis*).) "And, just as affirmative conduct and circumstances can show that a criminal threat was made, the absence of circumstances that would be expected to accompany a threat may serve to dispel the claim that a communication was a criminal threat. [Citation.]" (*Ryan D., supra*, 100 Cal.App.4th at p. 860.)

The fourth and fifth elements of section 422 require the victim "reasonably to be in sustained fear" for his or her own safety or the safety of his or her family. (§ 422.) As used in the statute, "sustained" has been defined to mean "a period of time that extends beyond what is momentary, fleeting, or transitory. . . . The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear. [Citation.]" (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 [40 Cal.Rptr.2d 7].)

## C. *Cases involving conditional threats*

We will now review relevant cases that address the third element of section 422, that the threat must be "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat."

In *David L., supra*, 234 Cal.App.3d 1655, the minor had been harassing the victim at school for some time. One day, the minor walked up to the victim with a belt wrapped around his fist. The minor pushed the victim against the lockers and swung at him. The victim swung back and knocked the minor down. The next day, the minor called the victim's friend and said he was angry about the fight. The friend asked what he was going to do. The minor told her to listen, and he made a metallic clicking sound into the telephone. The minor said that sound was a gun and he was going to shoot the victim, and the friend related the threat to the victim. A juvenile court found the minor violated section 422. (*David L.*, at p. 1658.)

In *David L.*, the minor argued the evidence did not support the juvenile court's finding that he violated section 422, because his statements on the telephone were mere "juvenile braggadocio," and there was no evidence of "imminent" conduct because he lacked the ability to carry out the threat. (*David L., supra*, 234 Cal.App.3d at p. 1660.) *David L.* rejected these arguments, and held the minor's statements satisfied the statutory elements

because the threat was immediate and unconditional, it conveyed the immediate prospect of execution, and section 422 did not require the showing of an immediate ability to carry out the stated threat. (*David L.*, at p. 1660.)

"The minor's threat to shoot the victim was not 'on its face and under the circumstances in which it [was] made' either conditional or in jest. According to the testimony, *it was without equivocation or ambiguity*. The minor's statement is well within the contemplation of section 422.

"The threat was also sufficiently specific. *Although it did not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.* It is enough to threaten 'death or great bodily injury to another person.' The minor's threat to shoot the victim easily satisfies that element of the statute." (*David L., supra*, 234 Cal.App.3d at p. 1660, italics added.)

*David L.* was approvingly cited by this court in *Butler, supra*, 85 Cal.App.4th 745, which addressed a situation that erupted after the defendant and his associates harassed and assaulted fellow residents at an apartment complex. The residents were meeting in one apartment to discuss the problem created by the defendant's conduct when the defendant and his friends arrived and tried to break up the meeting. At one point, the defendant grabbed the arm of Virginia, one of the residents, as she was surrounded by five or six of his friends. The defendant told Virginia that "she should mind her own business, that his gang, 'El Norte,' owned the apartments," called her demeaning names, and "told her she needed to mind her own business or she 'was going to get hurt.' Virginia felt very intimidated because the group had followed her and surrounded her while she was alone; she perceived [the] defendant's statement as a threat; and she was afraid they would hurt her." (*Id.* at p. 749.) A physical altercation later occurred as the defendant and his friends assaulted other residents. (*Id.* at pp. 750–751.) The defendant was convicted of making criminal threats to Virginia, along with assault with a deadly weapon and battery on the other residents. (*Id.* at p. 748.)

*Butler* rejected the defendant's argument that his statements to Virginia were too ambiguous to constitute a threat under section 422. "A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' [Citation.]" (*Butler, supra*, 85 Cal.App.4th at p. 752, quoting *David L., supra*, 234 Cal.App.3d at p. 1660.)

*Butler* also focused on the circumstances in which the defendant made the statements to Virginia and how he acted before, during, and after the threat:

"The circumstances here . . . establish that defendant's threat to hurt Virginia was a violation of section 422. Virginia was aware [that other residents] were in fear because defendant and his friends had been terrorizing them. Defendant and four or five other teenagers surrounded Virginia at her apartment complex. Defendant not only confronted her, he impressed upon Virginia just how serious he was by grabbing her arm, i.e., committing a battery upon her when he made his threat. In doing so, he emphasized his willingness and intent to hurt her if she did not mind her own business. [Citations.] Defendant further impressed upon Virginia the gravity of the situation by bragging that his gang . . . owned the apartments. . . . Virginia felt very intimidated because the group surrounded her while she was alone, and she perceived defendant's statement to be a threat. *While there was no evidence presented at trial, other than defendant's own statements, that defendant was a member of the Nortenos gang, there was no basis for Virginia to doubt this alleged association.*" (*Butler, supra,* 85 Cal.App.4th at pp. 754–755, italics added, fn. omitted.)

In contrast to *David L.* and *Butler,* the court in *Ricky T., supra,* 87 Cal.App.4th 1132, reversed the juvenile court's finding because of insufficient evidence that the minor violated section 422. The incident in *Ricky T.* began when the 16-year-old minor left class to use the restroom and found the classroom door locked when he returned. The minor pounded on the door, the teacher swung it open, and the door hit the minor. The minor became angry, cursed at the teacher, and said, " 'I'm going to get you.' " The teacher sent the minor to the office and the police were called the next day. A week later, the minor admitted to an officer that he told the teacher that he was going to " 'kick [his] ass,' " and he was charged with violating section 422. (*Ricky T.,* at pp. 1135–1136.)

*Ricky T.* reversed the juvenile court's finding that the minor violated section 422, and held the circumstances of the minor's statements showed his alleged threats lacked credibility because they were not "serious, deliberate statements of purpose." (*Ricky T., supra,* 87 Cal.App.4th at p. 1137.) The teacher's act of sending the minor to the office did not establish the threat was "so immediate" under section 422, since the police were not contacted until the next day. There was no evidence suggesting a physical confrontation was imminent or that the teacher and minor had any prior history of conflicts. The court concluded the minor's remark, " 'I'm going to get you' [was] ambiguous on its face and no more than a vague threat of retaliation without prospect of execution." (*Ricky T.,* at p. 1138.)

D.   *Cases involving threats made in custodial situations*

We now turn to cases in which the defendants made threats while in custodial situations. In *People v. Franz* (2001) 88 Cal.App.4th 1426 [106

Cal.Rptr.2d 773] (*Franz*), the defendant broke up with his former girlfriend, Schmidt, but they continued to see each other and he hit her on one occasion. Schmidt was afraid of him because he previously said she would be sorry if she called the police on him. (*Id.* at p. 1433.) One evening, the defendant saw Schmidt and her two male friends on the street as they went home from work. Schmidt and her friends rushed to Schmidt's house and closed the drapes so no one could see inside. The defendant arrived at the house and tried to get in through a window. Schmidt went outside to talk to him and he pushed his way inside. He demanded to know who her friends were, and then he assaulted her and repeatedly threatened to kill her. He also assaulted her two friends, Zook and Immer, as they called 911 for help. (*Id.* at p. 1434.) When the police arrived, Schmidt ran outside and asked for help. Another officer went into the house and spoke to Zook and Immer while the defendant stood behind the officer. The defendant was not yet in custody, and he looked directly at the two witnesses and made hand gestures and said "shush," and then ran his finger across his throat as they spoke to the officer. The defendant was later arrested and taken into custody. (*Id.* at pp. 1436–1437, 1442–1443.)

In *Franz*, the defendant was convicted of violating section 422 based on saying "shush" and hand gestures he made to Zook and Immer as they spoke to the officer, and the court held the convictions were supported by substantial evidence. (*Franz, supra,* 88 Cal.App.4th at p. 1438.) *Franz* relied on *Bolin* and held: "defendant's shushing noise, accompanied by the throat-slashing gesture, was 'so' unequivocal that it conveyed to Zook and Immer a sufficient gravity of purpose and immediate prospect of execution of the threat." (*Franz,* at p. 1448.) *Franz* also held the defendant's throat-slashing gesture was sufficiently immediate even though an officer was present and he was taken into custody. (*Ibid.*)

"Defendant suggests there is no substantial evidence of immediacy because the police officer was present during the threat and thereafter escorted defendant away from the scene, and neither juvenile saw defendant again until prosecution of this matter. However, defendant fails to cite any evidence as to when the minors next saw defendant. *In any event, at the time of the threat the minors did not know when they would next see defendant. The immediacy factor was present in the surrounding circumstances that defendant was in a rage.* He had already hit [the girlfriend], punched Zook, and said he was going to kill Zook, as documented by the 911 call. *Although the officer was present when defendant made the threat, the threat and surrounding circumstances were a reminder that the officer would not always be there to protect the minors.*

"Defendant argues there was insufficient evidence to support the terrorist threat conviction as to Immer, because there was evidence defendant looked

at Zook when he made the threat, but there was no evidence defendant looked into Immer's eyes. We disagree. Zook and Immer were in close proximity; they were both sitting on the same bed. Obviously, defendant attempted to dissuade both witnesses." (*Franz, supra*, 88 Cal.App.4th at p. 1449, italics added.)

In *Gaut, supra*, 95 Cal.App.4th 1425, the defendant both verbally and physically abused his girlfriend for nearly one year. He also bragged to her that he pistol-whipped a former girlfriend and would have shot that girlfriend if others had not intervened. When the current girlfriend finally threw him out of her house, he repeatedly confronted her and vandalized her property. She obtained a restraining order, but he continued to call her and left telephone messages that he would do " 'some real ugly shit' " to her. She finally called the police, and he was arrested near her residence. The defendant called her from jail while he was awaiting his parole hearing and told her that she was going to die. The victim attended his parole hearing because she feared he was going to be released and gave the police a recording of his telephone messages. The defendant was convicted of making criminal threats based on the telephone calls from jail, when he said that she was going to die. (*Id.* at pp. 1428–1431.)

On appeal in *Gaut*, the defendant argued there was insufficient evidence to support his section 422 conviction because his telephonic threats did not convey an immediate prospect of execution since he was incarcerated and unable to carry out the threats when he made the calls. (*Gaut, supra*, 95 Cal.App.4th at p. 1431.) *Gaut* rejected that argument, and held the nature of the defendant's threats had to be viewed based on his history of domestic violence against the victim. "In this case, defendant had a lengthy history of not only threatening but also physically assaulting [the victim]. Between November 1999 and June 2000, defendant: pushed [her] against the wall on several occasions; pulled her clothing and hair; broke into her apartment; tore up her belongings; disabled her car; smashed his fist through her car window; and verbally abused her. In addition, defendant said he had pistol-whipped his former girlfriend and intended to shoot her. *It was reasonable for [the victim] to fear that defendant would also follow through on the threats he made from jail based on the totality of the circumstances.* [Citations.] *In addition, the first series of threats preceded defendant's parole violation hearing. Not only did [the victim] fear defendant would be released following the hearing, but also his threats made reference to the fact that she had only a few days until he would be released*: 'Just three more days'; 'You got [*sic*] three more days to apologize for your disrespect'; and 'Hey tramp. I'm gone [*sic*] spare you one more day.' Moreover, both before and after his parole hearing, *defendant made reference to the fact that he would send someone to get her*: 'Somebody gone [*sic*] come see you . . . .' There was evidence of defendant's past domestic abuse of both [the victim] and his former girlfriend. This further supported [the victim's] fears his threats were specific, unequivocal, and

immediate. [Citations.] As our colleagues in the Fifth District Court of Appeals have held: 'A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does "not communicate a time or precise manner of execution, section 422 does not require those details to be expressed." ' [Citations.]" (*Gaut, supra*, 95 Cal.App.4th at pp. 1431–1432, italics added, citing *Butler, supra*, 85 Cal.App.4th at p. 752.)

In *Mosley, supra*, 155 Cal.App.4th 313, the defendant was convicted of multiple counts of making criminal threats to correctional officers while he was an inmate at the Los Angeles County Twin Towers Correctional Facility. The defendant boasted to one officer that he was going to use a telephone while in a courthouse lockup facility, obtain the officer's contact information from DMV (the Department of Motor Vehicles), and pass that information to his gang associates so they could kill the officer and rape his wife. The defendant told another officer that he was going to do the same thing that another inmate did, which was to get the officer's personal information from DMV so he could have the officer attacked. (*Id.* at pp. 315–318.) The defendant repeatedly talked to officers about the recent murder of an officer at the Chino facility, said that killer was in his same gang, and said that he was going to slice up an officer himself. The defendant also bragged that he knew a particular officer's work schedule and would have someone waiting at his house when he got home. The defendant was repeatedly found in possession of weapons in his cell, and he said he was going to use a razor to attack one of the officers he had repeatedly threatened. The defendant learned how to manipulate the cell door locks, and the officers discovered the metal locking mechanism in his cell was fatigued. The defendant also said he knew how to get information about the officers' home addresses when he was released. (*Id.* at pp. 315–321.)

*Mosley* held the defendant's convictions for violating section 422 were supported by substantial evidence as to each officer, and rejected his argument that the threats were not imminent since he was an inmate in a segregation module. "In this case, for purposes of appeal, defendant does not deny that he made the threats. Rather, he attempts to minimize their significance by pointing out that he was known as a difficult inmate and the deputies were in control of his confinement and limited movement. However, in each instance, the deputies were placed in fear because of defendant's ability to obtain weapons as well as his 'connections' in the gang within the community. . . ." (*Mosley, supra*, 155 Cal.App.4th at p. 324.) *Mosley* went through the particular details of the defendant's statements to each officer at length. *Mosley* concluded there was substantial evidence to support each count because the threats were unequivocal, immediate, and specific, and conveyed the immediate prospect of execution, given defendant's gang connections, his ability to obtain weapons in prison, the fact that the locking

mechanism in his cell had been worn down, and his repeated boasts that he knew exactly how to obtain personal information about each officer and that he intended to use that information to kill those officers and their families. (*Id.* at pp. 324–326.)

E. *Analysis*

Turning to the facts of this case, we find that defendant's conviction for making criminal threats against Officer Thornberry is supported by substantial evidence based on the five factors required to prove the offense. Defendant willfully threatened to inflict death or great bodily injury when he said that he had killed officers in the past, said he would "blast" Thornberry, and simulated pulling a trigger with his fingers. Defendant made the threat with the specific intent that his statements would be taken as threats—defendant repeatedly said that he had previously killed officers, that was what he did, he would find people, he had done it before, he would do it again, and he would find Thornberry and blast him.

We also find defendant's threat was " 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat.' " (*Toledo, supra*, 26 Cal.4th at p. 228.) Defendant asserts there is insufficient evidence of this element of section 422 because the circumstances in this case are "much different than that in *Mosley*," and further argues that "[t]he logic of *Mosley* does not apply here." We agree that the instant case is factually inapposite to *Mosley*. In contrast to *Mosley*, there was no evidence that defendant had outside contacts, demonstrated an ability to obtain weapons in prison, or had the apparent means to carry out the threat at that exact moment. Nevertheless, defendant's conviction is supported by substantial evidence because he unequivocally told Thornberry that he would carry out that threat when he was released from custody in precisely 10 months, thus giving the threat specificity, immediacy, and a date certain. The immediacy of the threat was explicit when defendant said, "You know, I find people. That's what I do. And I'm going to find you and blast you." Leaving no doubt, he added, "I get out in ten months." The only condition attached to the threat was that defendant intended to carry it out when he was released in 10 months. Defendant effectively made an appointment to kill Thornberry at his earliest possible opportunity—he would perform the act the instant he was set free.

Defendant's threat caused Thornberry to reasonably be in sustained fear for his life, particularly when he learned that defendant was actually scheduled to be paroled in 10 months. Indeed, the trial court took judicial notice that defendant's CDCR file showed a parole release date of July 7, 2008, although

he remained in custody and was booked on the current charges. This is not a case where a prisoner serving a lengthy or indeterminate term engaged in idle boasts about what he wanted to do if he was ever released from custody at some future and undefined time.

Defendant argues his encounter with Officer Thornberry was "one of the regular occurrences" when an inmate engages in "trash talk" with a correctional officer. In contrast to *Ricky T., supra,* 87 Cal.App.4th 1132, however, defendant did not make vague statements in the heat of an extremely brief moment. While there was no prior history between Thornberry and defendant, defendant created his own personal history and repeatedly escalated the intensity of the situation during his encounter with the two officers. When he was in the office, he taunted the officers about whether they were going to beat him, and then talked about killing officers, claimed he had done so in the past, and announced he would do it again. As the officers escorted him across the yard, defendant looked directly at Thornberry and declared, "I can find anybody and blast them. That's what I do." Once they reached the clinic, the officers placed defendant in the holding cell and defendant called Thornberry by his name as he was about to leave. Defendant again vowed to blast him and used both hands to mimic the action of guns. Defendant thus provided his own backstory to establish the specificity and immediacy of the threats against Thornberry.

Defendant contends his statements and the surrounding circumstances failed to convey "a gravity of purpose and immediate prospect of execution to . . . the alleged victim" since he was in custody and under the complete control of law enforcement officers when he made the statements. Similar arguments were rejected in *Franz* and *Gaut.* In *Franz,* the defendant argued his threatening gestures to the two witnesses lacked immediacy because an officer was present and the defendant was taken into custody. As *Franz* explained, however, the immediacy factor was present in the surrounding circumstances because the defendant was enraged about his former girlfriend; the recipients of the threats knew the officer would not always be there to protect them; and the recipients did not know, at the time of the threats, when they would next see the defendant. (*Franz, supra,* 88 Cal.App.4th at pp. 1448–1449.) *Gaut* similarly held that even though the defendant was in custody when he made threatening calls to his girlfriend from jail, his threats were sufficiently immediate because of his past history of domestic violence. More importantly, however, the defendant in *Gaut* repeatedly tied his telephone threats to his expectation of being released at his upcoming parole hearing. "Not only did [the victim] fear defendant would be released following the hearing, but also his threats made reference to the fact that she had only a few days until he would be released . . . ." (*Gaut, supra,* 95 Cal.App.4th at p. 1432.) In this case, defendant provided far more specificity and immediacy than the defendants in *Gaut* and *Franz:* he claimed he had a

history of finding and killing officers, and declared he would blast Thornberry when he was released in 10 months.

Defendant asserts his statements were not criminal threats within the meaning of section 422 because, taking him at his word, "he was not going to do anything for at least ten months" and there was no evidence he had the ability to "find" Thornberry in the future. As explained in *David L.* and *Butler*, however, "[a] threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' " (*Butler, supra,* 85 Cal.App.4th at p. 752, quoting *David L., supra,* 234 Cal.App.3d at p. 1660.) *David L.* and *Butler* found substantial evidence to support the section 422 convictions in those cases even though the defendants' statements were open-ended, without a specific time or triggering event for the defendants to execute the threats. If a threat is sufficiently specific and immediate, even if the speaker fails to communicate a time or precise manner of execution, then defendant's threats in this case would also be specific and immediate, since defendant specified the exact time and place that he would execute the threat—he would be released in 10 months and he would find Thornberry and blast him.

Defendant argues that even if he intended to carry out his threats when he was paroled in 10 months, that period of time was too attenuated to satisfy the third factor to prove a violation of section 422, that the threat was "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (§ 422.) As we explained in part I.A., *ante,* however, this language was added to the amended version of section 422, based on *Kelner, supra,* 534 F.2d 1020 and *Watts, supra,* 394 U.S. 705 to satisfy constitutional concerns and prevent criminal prosecution of protected speech. (*Bolin, supra,* 18 Cal.4th at pp. 338–339.) There is no evidence the phrase was intended to place a limited timeline on when a specific and unconditional threat would be executed. Indeed, it has been held that section 422 "does not require an immediate ability to carry out the threat." (*People v. Lopez, supra,* 74 Cal.App.4th at p. 679; see *People v. Smith, supra,* 178 Cal.App.4th at p. 480.) "[W]e understand the word 'immediate' to mean that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out, should the conditions not be met." (*Melhado, supra,* 60 Cal.App.4th at p. 1538.) Defendant's threats satisfied this element of section 422 because his threats against

Thornberry were extremely specific and based only upon the "condition" and certainty of his upcoming release.[3]

Defendant concedes there was evidence about his specific parole date, but argues that factor "does nothing to erase the other important conditions on [his] having any real ability to carry out the threat," such as getting out of prison, obtaining a weapon, and finding Thornberry. A similar argument was made in *Butler*, where the defendant boasted to the victim that he and his gang controlled the apartment complex. On appeal, the defendant argued there was no independent evidence that he was part of a particular gang or that his gang controlled the area. As *Butler* explained, however, there was no reason for the victim in that case to doubt the defendant's statements given the nature and circumstances of his threats. (*Butler, supra,* 85 Cal.App.4th at pp. 754–755.) A similar situation exists in this case. Defendant repeatedly boasted that he had killed officers, he could find people, he had done it before and would do it again, and he would find Thornberry in 10 months and blast him. Given his prior convictions for criminal threats and evading an officer and his admitted prior assault upon a correctional officer, it was reasonable for Thornberry to believe that defendant was capable of carrying out his stated intentions.

We note that the dissent relies on *Solis, supra,* 90 Cal.App.4th 1002, for the recitation of the elements required to prove a violation of section 422. The dissent states that *Solis*'s list of elements is consistent with the California Supreme Court's list in *Toledo, supra,* 26 Cal.4th 221. (Dis. opn., *post,* at p. 825.) We respectfully disagree. *Solis* defines the third element of the offense as requiring proof that "the threat and the circumstances under which it was made lead the listener to believe the defendant would *immediately carry through on the threat* . . . ." (*Solis,* at pp. 1023–1024, italics added.) The California Supreme Court, however, has consistently defined the third element as requiring "that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . *so unequivocal, unconditional, immediate, and specific* as to convey to the person threatened,

---

[3] We fully appreciate the importance of the time element in determining whether a threat violates section 422. The appraisal of the immediacy of a threat under section 422 quite appropriately includes assessment of the sense of urgency and foreboding caused to the person being threatened. Our analysis of the time element is necessarily limited to the particular facts and circumstances of defendant's unequivocal threat to Officer Thornberry, and the issue of immediacy must be evaluated in context. (*Bolin, supra,* 18 Cal.4th at pp. 338–339; *Ricky T., supra,* 87 Cal.App.4th at p. 1137; *People v. Martinez, supra,* 53 Cal.App.4th at p. 1218.) The targeted officer had a sense of urgency and foreboding which was reasonable under the circumstances of this case. The threat of serious injury upon the occasion of release of the prospective assailant from prison in just 10 months *does* represent an immediate prospect of execution—not a distant event beyond the scope of section 422.

a gravity of purpose and *an immediate prospect* of execution of the threat . . . .' " (*Toledo*, at pp. 227–228, italics added; see *George T., supra*, 33 Cal.4th at p. 630.) We believe this distinction is significant in determining the meaning of the third element. The precise words in section 422, "immediate prospect of execution," have an entirely different meaning with a change in word order than the "prospect of immediate execution" or, as paraphrased in *Solis*, that the defendant would "immediately carry through on the threat." (*Solis*, at p. 1024.)

    The California Supreme Court has explained that interpreting section 422 requires review of the entirety and the context of the statutory language rather than isolating or focusing on a particular word. As the court said in *Bolin*: "[I]mposing an 'unconditional' requirement ignores the statutory quali-fication that the threat must be '*so* . . . unconditional . . . *as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution* . . . .' [Citation.] 'The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.]" (*Bolin, supra*, 18 Cal.4th at pp. 339–340.)[4]

    The dissent maintains that the term "immediate prospect of execu-tion" is so clear that any attempt to define it represents lack of deference to the Legislature. (Dis. opn., *post*, at pp. 827–828.) Again, we respectfully disagree. There is no doubt about the importance of ascertaining and fulfilling legislative intent—and that is precisely what we seek to do. As we note, we are not the first to construe section 422. The Supreme Court did so in *Bolin*. While the *Bolin* court limited itself to consideration of the term "uncondi-tional," its interpretation of the whole statute and consideration of its context offers clear guidance. In a unanimous opinion, the court made clear that "the reference to an 'unconditional' threat in section 422 is not absolute." (*Bolin, supra*, 18 Cal.4th at p. 339.)     It would be incongruous to apply one standard to the first term in a series of elements of the crime and a different, ostensibly more restrictive, standard of interpretation to the other elements that follow. To conclude otherwise would suggest that the *Bolin* court itself erred in failing to apply a strict, narrow construction of a key element of the crime.

---

[4] *Bolin* declined to address the meaning of the phrase " 'an immediate prospect of execution of the threat' " because of particular instructional issues in that case which prevented review, rather than an attempt to evade the issue. (*Bolin, supra*, 18 Cal.4th at pp. 340–341 & fn. 13.)

We thus conclude that, given the aggregate of factors in this case, defendant's conviction for making criminal threats against Officer Thornberry is supported by substantial evidence.

## II. *Jury instructions on section 76*

To violate section 76, subdivision (a), a threat must be directed against a member of a class of public officials and employees defined in the statute. This class includes "the staff" of "any . . . exempt appointee of the Governor." Defendant argues that the court erred when it instructed the jury that Officer Thornberry, as a correctional officer working in a state prison, was a member of the staff of an exempt appointee of the Governor, the warden of the prison. He contends that a correctional officer is not within the class of statutorily defined victims as a matter of law and that the jury should have been required to decide whether or not Thornberry came within the meaning of the statute, based on the evidence. We hold that a correctional officer working in a state prison is a member of the staff of an exempt appointee of the Governor as a matter of law, so the instruction was correct.

In its instructions on the section 76 charge, the court said, "To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant willfully threatened to kill or threatened to cause serious bodily harm to a member of the staff of an exempt appointee of the governor . . . ." After retiring to deliberate, the jury sent the judge a note, asking, "What if Mr. Wilson didn't know the warden is an exempt appointee of the governor?" Over defense counsel's objection, the court responded by modifying its instruction, so that the pertinent portion now said, "To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant willingly threatened to kill or threatened to cause serious bodily harm to a correctional officer, who is a member of the staff of an exempt appointee of the governor . . . ."

As modified, the instruction asked the jury to determine whether defendant threatened a member of the staff of an exempt appointee of the Governor, but required the jury to accept the proposition that a correctional officer is a member of the staff of such an appointee. This left the jury to determine whether Thornberry was, in fact, a correctional officer. This fact was established by uncontroverted testimony.

A jury instruction that relieves the prosecution of the burden of proving an element of an offense deprives the defendant of due process of law (*People v. Flood* (1998) 18 Cal.4th 470, 491 [76 Cal.Rptr.2d 180, 957 P.2d 869]), and the court is not permitted to instruct the jury that an element has been established as a matter of law (*People v. Yarbrough* (2008) 169

Cal.App.4th 303, 315 [86 Cal.Rptr.3d 674]). At the same time, "questions of law are to be decided by the court" and "questions of fact" by the jury (§ 1126), and resolving questions of statutory interpretation is the exclusive province of the court (*People v. Thomas* (1945) 25 Cal.2d 880, 897 [156 P.2d 7]; *People v. Penny* (1955) 44 Cal.2d 861, 867 [285 P.2d 926]).

Here, the factual question of whether Thornberry was within the class of victims defined by the statute was not taken away from the jury, for it had to find that he was a correctional officer. The only question is whether, in taking the position that every correctional officer employed in a state prison is within that class, the trial court made an error of law.

██ There is no doubt that a state prison warden is an exempt appointee of the Governor as a matter of law, for section 6050, subdivision (a) expressly says so: "The Governor, upon recommendation of the secretary [of the CDCR], shall appoint the wardens of the various state prisons. . . . The wardens shall be exempt from civil service." The remaining question is whether a correctional officer working in a state prison is a member of the "staff" of a warden as a matter of law.

██ A "staff" can be "a group of people assisting a chief, manager, president, or other leader," or merely "a specific group of workers or employees . . . ." (Webster's New World Dict. (2d college ed. 1982) p. 1384.) A correctional officer could be considered a member of the staff of a prison warden under either of these definitions, though the dictionary meaning does not point strongly toward either party's view of this matter. More helpful is a state regulation interpreting section 76. "Public official means any person identified in Penal Code Section 76. CDCR staff are considered the staff of an exempt appointee of the Governor." (Cal. Code Regs., tit. 15, § 3000.) An agency's interpretation of a statute " ' "may be helpful" ' " where " 'application of the settled rules of statutory interpretation does not clearly reveal the Legislature's intent . . . .' " (*Katosh v. Sonoma County Employees' Retirement Assn.* (2008) 163 Cal.App.4th 56, 63 [77 Cal.Rptr.3d 324].) While we need not, and do not, reach the question of whether every employee of the CDCR is a member of the staff of an exempt appointee of the Governor, we conclude the department's definition is correct at least with respect to correctional officers, who comprise the core group of workers who carry out most of the day-to-day operations for which the warden bears responsibility. One provision of section 76 itself reinforces this view. Subdivision (c)(1) provides that an apparent ability to carry out the threat—which is one of the elements of the offense—"includes the ability to fulfill the threat at some future date when the person making the threat is an incarcerated prisoner with a stated release date." This provision shows that the Legislature specifically contemplated the application of section 76 to threats made by prisoners.

Section 76 clearly was not intended to cover all subordinates of a single statewide department head as that appointee's "staff." However, the way in which California's prison system is organized also supports our conclusion that correctional officers at an individual prison are the staff of that prison's warden. It is not only the statewide head of the CDCR who is an appointee of the Governor. Rather, the warden of each individual prison facility is also an appointee of the Governor.

Defendant points out that the Penal Code section immediately following the one here under discussion states that "[t]he various provisions of this title, except Section 76, apply to administrative and ministerial officers, in the same manner as if they were mentioned therein." (§ 77.) He argues that correctional officers are administrative or ministerial officers, so section 76 does not apply to them. "[T]his title" is part 1, title 5, of the Penal Code, which is called "Of Crimes by and Against the Executive Power of the State." It contains provisions relating to bribes and other unauthorized receipt of funds by public officials (§§ 67, 67.5, 68, 70, 70.5, 73, 74); fraudulent claims upon public funds (§§ 72, 72.5); obstructing executive officers (§ 69); and threats against public officers and employees (§§ 71, 76). What could have been the Legislature's purpose in applying all these provisions to "administrative and ministerial officers," but not applying section 76 to them?

Our review of the legislative history reveals the following. Section 77 was enacted in 1872. (47 West's Ann. Pen. Code (1999 ed.) foll. § 77, p. 200.) Section 76 was enacted in 1982. (47 West's Ann. Pen. Code, *supra*, foll. § 76, p. 198.) At that time, section 77 was amended to exclude section 76 from its provisions. (47 West's Ann. Pen. Code, *supra*, foll. § 77, p. 200.) As enacted in 1982, section 76 did not protect "staff" of elected or appointed officials. Instead, its first sentence read, "Every person who knowingly and willingly threatens the life of any elected state official, exempt appointee of the Governor, or judge of the Supreme Court or court of appeal[] with the intent, and the apparent ability, to carry out such threat, is guilty of a public offense . . . ." (Stats. 1982, ch. 1405, § 1, p. 5360.) The amendment to section 77, enacted in 1982, excepting section 76 from the general rule that part 1, title 5, of the Penal Code applies to administrative and ministerial officers, must have been considered necessary to make it clear that section 76 applied only to the elected and appointed officials themselves. In 1994, section 76 was amended to add the staffs of elected and appointed officials to the class of protected potential victims. (Stats. 1994, ch. 820, § 1, p. 4071.) There was no corresponding amendment to section 77, however, to explain whether the protection of staff now meant administrative and ministerial officers were also protected by section 76. There are at least two possible explanations for this omission: It was an oversight, or the Legislature meant to make a distinction between staff and administrative and ministerial officers, and to continue

excluding the latter, or some subset of the latter who were not to be considered staff, from the protection of section 76.

The most plausible conclusion is that the Legislature did not intend to exclude correctional officers. If the failure to amend section 77 in 1994 was an oversight, then there is no need for further consideration of the effect of section 77 on section 76. If the Legislature did intend to withhold the protection of section 76 from some group of administrative or ministerial officers who are not considered staff of an elected or appointed official, it is improbable that it intended correctional officers to be within that group. As we have said, subdivision (c)(1) of section 76 contemplates threats by prisoners with stated release dates, and it is unlikely that the Legislature intended not to punish these threats when directed at correctional officers, who are in the class of the public employees toward whom prisoners have the greatest opportunity to direct threats.

Finally, defendant points out that section 76 includes a definition of " '[s]taff of a judge' " but no definition of the staff of a warden or any other exempt appointee of the Governor. The staff of a judge is defined broadly to mean "court officers and employees, including commissioners, referees, and retired judges sitting on assignment." (§ 76, subd. (c)(4).) Defendant says the absence of a similar broad definition of the staff of an exempt appointee of the Governor implies that no broad definition is intended, for "if section 76 was to apply to all persons working in a correctional facility, it would so state." We do not agree. Section 76 applies to "any elected public official, county public defender, county clerk, exempt appointee of the Governor, judge, or Deputy Commissioner of the Board of Prison Terms" and their staffs and immediate families. (§ 76, subd. (a).) The fact that the Legislature specifically defined judicial staff does not imply that it intended a narrower definition of the staff members of all the other covered types of officials.

III. *Defendant's conviction for violating section 76 is supported by substantial evidence.*

Defendant claims that insufficient evidence was presented at trial to prove a section 76 violation. Specifically, he says no evidence was presented to prove that Officer Thornberry was a member of the staff of an exempt appointee of the Governor. As we have explained, however, a correctional officer is a member of the staff of an exempt appointee of the Governor as a matter of law. The fact that Thornberry was a correctional officer was established by uncontroverted testimony and is not challenged on appeal. No other evidence was needed.

Defendant has not argued that there was insufficient evidence to establish any other element of the section 76 violation. He does not claim, for instance,

that the prosecution failed to show he had "the apparent ability to carry out that threat by any means." (§ 76, subd. (a).)

IV. *Abstract of judgment*

Defendant points out that the abstract of judgment erroneously cites section 667, subdivision (e), for each of the one-year enhancements for prior prison terms, both those that were stayed and those that were not stayed; the correct citation is section 667.5, subdivision (b). The People concede the error. We direct the trial court to issue a new abstract of judgment to reflect the holding of this opinion.

Defendant also points out the court checked both the box for life with the possibility of parole and the box for 25 years to life for counts one and two. The People acknowledge this but insist that no correction is needed, since defendant's sentence of 25 years to life also amounts to a sentence of life with the possibility of parole.

The checking of both boxes was erroneous. Defendant was sentenced to 25 years to life (plus four years) on those counts. The court did not impose an additional two sentences of life with the possibility of parole. Checking the box for life with the possibility of parole was unnecessary and could be confusing. We order that this mistake also be corrected.

## DISPOSITION

The trial court is directed to amend the abstract of judgment to correct the clerical errors discussed in part IV. of this opinion. In all other respects, the judgment is affirmed.

Hill, J., concurred.

**WISEMAN, Acting P. J.,** Concurring and Dissenting.—The majority opinion affirms Anthony Wilson's conviction of violating Penal Code[1] section 422, concluding that Wilson's threat "convey[ed]" the "immediate prospect of execution" required by the statute even though the victim understood that the threat could not be carried out for 10 months. The majority also holds that the requirement of an immediate prospect of execution imposes no time limit during which the threat must be carried out. I respectfully dissent from this conclusion because (1) it conflicts with the plain meaning of section 422; (2) no case has held that a prospect of execution 10 months away is an

---

[1] Subsequent statutory references are to the Penal Code.

immediate prospect of execution; and (3) there is no support for the majority's view that the Legislature did not intend to create *any* time limitation when it determined that a punishable threat must convey an immediate prospect of execution to the victim. I concur in the remainder of the majority opinion, including the holding that Wilson's conviction of violating section 76, and the life sentence for that offense, must be affirmed.

I begin with the many points regarding section 422, upon which I agree with the majority, as I take issue with only one. The majority opinion goes into great depth and cites cases at length in support of a number of other issues. For example, it points out that a threat can satisfy the *specificity* requirement of section 422 even though it does not state precisely when or where it will be carried out. (*People v. Butler* (2000) 85 Cal.App.4th 745, 752 [102 Cal.Rptr.2d 269].) It says section 422 does not require an *intent* to actually carry out the threat. (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1220 [62 Cal.Rptr.2d 303].) (Maj. opn., *ante*, at p. 806.) It observes that the statute requires no *actual ability* to carry out the threat. (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679 [88 Cal.Rptr.2d 252]; *In re David L.* (1991) 234 Cal.App.3d 1655, 1660 [286 Cal.Rptr. 398].) (Maj. opn., *ante*, at pp. 807, 808.) It also says the statute's requirement of *unequivocality* must be applied with reference to the context of the threat. (*In re George T.* (2004) 33 Cal.4th 620, 635 [16 Cal.Rptr.3d 61, 93 P.3d 1007].) (Maj. opn., *ante*, at p. 807.) I agree with all of these propositions. None of these points, however, shed light on the meaning of the requirement that the threat convey to the victim an immediate prospect of execution—the only real point in contention.

I have no doubt that Officer Thornberry's fear was reasonable. Simply stated, what happened was that Wilson told the officer he had killed correctional officers before and would find him and blast him after his release on parole 10 months later. Wilson was angry and agitated and repeated these statements a number of times during his single negative encounter with Officer Thornberry. He also made hand gestures mimicking pulling a trigger. Thornberry had never had an unusual encounter with Wilson before. Thornberry testified that he understood Wilson's threat to mean that Wilson would assault or kill him after Wilson's release in 10 months. Further, it turned out that Wilson did have a prior conviction for assaulting a correctional officer, a fact Officer Thornberry verified later.

These facts do not prove, however, that the threat conveyed an *immediate* prospect of execution, as required by section 422. The prospect of carrying out a threat in 10 months is not consistent with the plain meaning of the word "immediate." Immediate is defined as "not separated in time; acting or happening at once; without delay; instant." (Webster's New World Dict. (2d college ed. 1982) p. 701.)

I believe the court in *People v. Solis* (2001) 90 Cal.App.4th 1002, 1023–1024 [109 Cal.Rptr.2d 464], correctly defined the elements of section 422: "(1) the defendant willfully threatens to kill or seriously injure another person; (2) the defendant has the specific intent that the listener understands the statement to be a threat; (3) the threat and the circumstances under which it was made *lead the listener to believe the defendant would immediately carry through on the threat*; and (4) the threat causes the listener to suffer sustained fear based upon a reasonable belief the threat would be carried out." (Italics added.) This list is consistent with the Supreme Court's list in *People v. Toledo* (2001) 26 Cal.4th 221, 227–228 [109 Cal.Rptr.2d 315, 26 P.3d 1051], which the majority quotes. (Maj. opn., *ante*, at p. 805.) A threat the listener understands to mean that the defendant will assault him in 10 months is not one that, as required under section 422, leads the listener to believe the defendant will immediately carry through on it.

Unlike other decisions addressing threats made by incarcerated prisoners, there was no evidence that Wilson said or that Officer Thornberry believed Wilson could carry out an immediate attack while in prison; could direct others outside the prison to carry out an immediate attack; or would be released within a few days and carry out an attack. The only "prospect of execution" at issue was the prospect of Wilson being released from prison in 10 months as scheduled, and at that time obtaining means to carry out an assault, finding Thornberry, and assaulting him.

*People v. Mosley* (2007) 155 Cal.App.4th 313 [65 Cal.Rptr.3d 856] (*Mosley*) and *People v. Gaut* (2002) 95 Cal.App.4th 1425 [115 Cal.Rptr.2d 924] (*Gaut*)—cases the majority cites because they involved incarcerated defendants (maj. opn., *ante*, at pp. 812, 813–814)—do not support the majority's view. In both *Mosley* and *Gaut*, the threats conveyed a prospect that they could be carried out right away, even though the defendants were incarcerated. Mosley and Gaut both claimed an ability to direct persons outside the jail to carry out the threats. Mosley also claimed he could carry out his threats himself inside the jail, using weapons that evidence showed he could obtain there. Gaut's threats included a claim that he would be released and could carry them out in three days. Nothing that could similarly show an immediate prospect of execution was present in this case. There was no evidence that Wilson could gain or had ever gained access to a weapon in the prison, that he was able or claimed to be able to direct an attack by someone outside the prison, or that his release was imminent. There was no evidence that the threat conveyed any information of this kind to Officer Thornberry.

*People v. Franz* (2001) 88 Cal.App.4th 1426 [106 Cal.Rptr.2d 773] comes a little closer to supporting the majority's opinion, but still does not carry the day. As the majority opinion explains (maj. opn., *ante*, at pp. 810–811), Franz broke

into a house and assaulted the victims. The police were called and when they arrived—but before they took Franz into custody—he told the victims to shush and drew his finger across his throat to express a threat to kill them if they told the police what happened. The court held that this threat conveyed an immediate prospect of execution to the victims because the victims did not know when they would see Franz again. In fact, Franz had not even been arrested yet. From the victims' point of view, Franz might not be arrested at all and might carry out the threat as soon as the police left, or he might be arrested and quickly released. The facts in Wilson's case are not similar. It is undisputed that the threat Wilson made to Officer Thornberry was the prospect of harming the officer when Wilson got out of prison in 10 months—not anytime sooner.

Section 422 proscribes threats which are "so . . . unconditional . . . as to convey to the person threatened . . . an immediate prospect of execution of the threat . . . ." Cases interpreting the "so . . . unconditional" element of the offense do not solve our problem in interpreting whether a threat conveys an immediate prospect of execution. True, as the majority points out, the modifier "so" in section 422 governs the first occurrence of "immediate," as well as "unconditional" (and also "unequivocal" and "specific"), and the Supreme Court relied on "so" to support its conclusion that a threat need not be absolutely unconditional to fall within the statute's proscription. (*People v. Bolin* (1998) 18 Cal.4th 297, 340 [75 Cal.Rptr.2d 412, 956 P.2d 374] (*Bolin*).) (Maj. opn., *ante*, at p. 818.) The word "so" does not, however, modify "immediate prospect of execution." The entire phrase reads, "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . ." (§ 422.)

In fact, in *Bolin*, which is the leading case on the issue of conditional threats, the Supreme Court expressly refrained from stating any conclusion on the immediate-prospect-of-execution requirement. (*Bolin, supra*, 18 Cal.4th at p. 340.) Though it relies on *Bolin* heavily and quotes it at length, the majority opinion mentions only in passing the fact that the opinion avoided expressing a view on the issue now before us.[2] (Maj. opn., *ante*, at p. 818.) Other cases the majority cites in its discussion of conditional threats are no more helpful.

---

[2] Contrary to the majority's contention, I have said nothing suggesting that the *Bolin* court erred. (Maj. opn., *ante*, at p. 818.) *Bolin* held that the phrase "so . . . unconditional" does not exclude some degree of conditionality, because "so" implies degrees. (*Bolin, supra*, 18 Cal.4th at p. 340.) I agree with that analysis. The phrase "immediate prospect of execution" is not governed by the word "so" occurring earlier in the sentence, however, so the analysis does not apply, as the Supreme Court itself implicitly acknowledged when it declined to address the issue we now face. (*Ibid.*) Even if the analysis did apply, it would not support the majority's interpretation of the statute, which is that the prospect of execution conveyed by the threat need not be immediate in any degree, since there is no temporal limitation at all.

Section 422, like any other criminal threat statute, cannot help embracing *some* degree of future contemplated action. The very idea of a threat necessarily implies future action. Further, section 422 contains other words implying that future events are contemplated: A "prospect"—even a prospect of immediate execution—is a view or a conception of what *will* happen; and "sustained" fear is fear that will continue on for some time into the future after the threat is made but before it is carried out.

Still, the words "immediate prospect of execution" must impose some time limitation on the prospect of execution; otherwise, there would have been no need to include them. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1010 [44 Cal.Rptr.3d 632, 136 P.3d 168] ["interpretations that render statutory terms meaningless as surplusage are to be avoided"].) The fact that the very nature of threats means *some* passage of time must be contemplated by the statute does not make the immediate-prospect-of-execution requirement compatible with a 10-month delay in the possibility of the threat being carried out, where knowledge of that delay was conveyed to the victim. None of the cases the majority cites come even close to holding that an expectation that a threat will be carried out in 10 months is an immediate prospect of execution.

One cannot help but ask, would the conveyance to a victim of *any* delay in the possibility of carrying out a threat be incompatible with the majority's reading of the statute? Would five years be too long? Ten years? Twenty years? The majority opinion expressly rejects the view that the requirement of an immediate prospect of execution imposes a time limit of any kind. It says the "historical background" of section 422 "suggests" that the language including the immediate-prospect-of-execution requirement "was not intended to impose a specific time limitation upon the speaker's intent to execute the threat, but instead to avoid First Amendment challenges . . . ." (Maj. opn., *ante*, at p. 804.) It also says, "There is no evidence the phrase was intended to place a limited timeline on when a specific and unconditional threat would be executed." (Maj. opn., *ante*, at p. 816.)

The majority says the statute does not impose a *specific* time limitation, as opposed to merely a time limitation. The majority does not explain what it means by this qualification. A specific time limitation as opposed to what—a general one? The discussion in footnote 3 of the majority opinion does not clarify the point. Although the majority says it "fully appreciate[s] the importance of the time element," it goes on to discuss the "sense of urgency and foreboding" the threat conveyed, not an amount of time to its execution. (Maj. opn., *ante*, at p. 817.)

The majority's view that there are no time limitations is noteworthy for several reasons. First, it conflicts with the plain meaning of the words the

Legislature chose to use. If an immediate prospect of execution is not a prospect of execution within a limited time, it is not clear what other meaning the phrase might have. The Legislature's words themselves are the "evidence" of its intent.

Second, the majority's analysis poses a false dilemma. It suggests that the Legislature's purpose was *either* to impose a time limitation *or* avoid constitutional problems. Wouldn't a much easier analysis be that the Legislature intended to do both? It intended to avoid constitutional problems by limiting the types of threats to be prohibited, and one means it chose for doing so was to impose a time limit on the prospect of execution that a threat conveyed.

Third, the majority seems to conclude that if a court can identify the Legislature's motivation for including language in a statute, for example, a desire to address constitutional concerns arising from a previous version of the statute, then the court need not apply the words the Legislature actually selected as its preferred means of satisfying those objectives. Whether it intends to or not, the majority opinion essentially has written the immediate-prospect-of-execution requirement out of the statute. Depending on your perspective, this may be a good or a bad result. Either way, in my view, it is a decision for the Legislature.[3]

In summary, the majority's conclusion is inconsistent with the statutory language of section 422 and is unsupported by case authority. Since the evidence does not support the conclusion that Wilson's threat conveyed to Officer Thornberry an immediate prospect of execution, I would reverse the section 422 conviction. I agree with the majority's reasoning regarding the

---

[3] I do not "maintain[] that the term 'immediate prospect of execution' is so clear that any attempt to define it represents lack of deference to the Legislature," as the majority opinion mistakenly asserts. (Maj. opn., *ante*, at p. 818.) The majority opinion does not "define" the term. Instead, it declines to apply the term at all, holding that the statute has the same effect with the term as it would have without it. In my opinion, *that* constitutes a lack of deference to the Legislature. What is "so clear" is that a prospect of execution in 10 months is not an immediate prospect of execution.

The majority opinion states that an "immediate prospect of execution" has a meaning different from a "prospect of immediate execution," and that the Legislature chose the former phrase. This distinction cannot bear the weight the majority places on it. A threat conveying a prospect of immediate execution conveys that it will be carried out right away, as the majority seems to concede. In the majority's view, however, a threat conveying an immediate prospect of execution can convey that it will not be carried out until a point in the distant future—no matter how far. If the Legislature had intended this result, it is hard to understand why it would have expressed its intent through a subtle choice of word order when simply omitting the immediate-prospect requirement would have had the same effect.

section 76 conviction, its conclusion that that conviction and the life sentence for it must be affirmed, and its holding on the corrections to the abstract of judgment.

Appellant's petition for review by the Supreme Court was denied October 20, 2010, S184769. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.