Filed 5/28/14  P. v. Ferea CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037332 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1087198) |
| v. | |
| WILLIAM JOHN FEREA, | |
| Defendant and Appellant. | |

Defendant William John Ferea was convicted by a jury of one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and one count of threatening to commit a crime resulting in death or great bodily injury (*id*., § 422).  The jury found him not guilty on a charge of first degree burglary (*id*., §§ 459, 460, subd. (a)).  In a bifurcated proceeding, the trial court found true the special allegations that Ferea had a prior strike conviction (*id*., §§ 667, subds. (b)-(i), 1170.12) and a prior serious felony conviction (*id*., § 667, subd. (a)).

Prior to sentencing, Ferea moved for a new trial based on a claim of juror misconduct.  The trial court denied the motion.  At sentencing, after denying Ferea's *Romero*[1] motion, the trial court sentenced him to a total term of 10 years and four months in prison.

On appeal, Ferea argues:  (1) the trial court erred in admitting evidence of Ferea's prior encounters with police officers; (2) the trial court erred in limiting the evidence of

---

[1] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

prior convictions Ferea could use to impeach the victim's testimony; (3) the trial court erred in admitting irrelevant evidence of injuries to Ferea's wife and permitting the prosecutor to ask prejudicial questions about the cause of those injuries; (4) there was insufficient evidence to support his conviction for making criminal threats; and (5) the trial court erred in denying his motion for new trial. In a supplemental brief, Ferea argues the trial court's denial of his new trial motion was a violation of his constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution.

We reject all of Ferea's arguments and will affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Charges*

Ferea was charged by information with burglary (Pen. Code, §§ 459, 460; count 1), assault with a deadly weapon (*id.*, § 245, subd. (a)(1); count 2), and making a criminal threat (*id.*, § 422; count 3). The information further alleged Ferea had both a prior strike (*id.*, §§ 667, subds. (b)-(i), 1170.12) and a prior serious felony conviction (*id.*, § 667, subd. (a)).

### B.    *Prosecution case*

#### 1.    *Victim's testimony*

The victim, Michael Vest, testified he was not feeling well and was sleeping in his bedroom on the afternoon of September 8, 2010, when he suddenly woke up to discover Ferea in his room.[2] Ferea was drunk and mumbling incoherently.

Vest told Ferea to get out, but Ferea did not do so. He just kept mumbling and was so drunk Vest was unable to understand him. Vest became angry and told Ferea to "get the fuck out." When Ferea still made no move to leave, Vest pushed him out the bedroom door. Ferea took a swing at Vest, but missed.

---

[2] Vest admitted he may have seen Ferea in his home earlier that day, playing video games and possibly drinking with Vest's adult son.

2

Now in the hallway, the two men began wrestling. Ferea grabbed Vest's hair, pulling out a substantial clump, and Vest punched Ferea in the face. Ferea punched back, but never connected. Ferea was hollering something that Vest could not understand, and after a couple of minutes, Vest was able to push Ferea out the front door. Vest thinks he may have also told everyone else in the house, including his son, to get out, after which he locked the door and went back to bed.

A few minutes later, Vest heard a noise in the living room and went out to find Ferea standing inside his house, along with Vest's adult nephew. Vest was confused because his nephew did not have a key, and he thought no one else could have let them in. After later inspecting his front door, he believed Ferea had forced his way in.

Ferea was angry, acting "all crazy," and drunkenly mumbling some "crazy stupiditiness [*sic*]." Vest told him to leave, but Ferea ignored him. Vest then noticed that Ferea was holding a meat cleaver and his hands and face were bloody. Ferea brandished the cleaver at Vest.

Vest ran around the television in his living room and was able to run out the front door. Ferea chased after Vest, still brandishing the meat cleaver over his head. Vest went around the outside of his house, with Ferea in pursuit. Once he got back to the front, Vest ran inside and barricaded his door. He then went back to bed.

Vest denied having any kind of weapon during his encounters with Ferea that afternoon.

Vest also testified that, at the time of trial, he was serving a six month sentence on an unrelated matter and he and Ferea were housed near each other in the county jail. Ferea contacted Vest and asked if Vest would "go to bat for [him]," i.e., not testify against him. About three or four weeks before the trial, Ferea called Vest a "rat." Ferea and Vest also exchanged notes and Ferea gave Vest a copy of the police report. Vest subsequently wrote to Ferea asking for some soup, coffee, and "an apology or something."

### 2. D.C.'s testimony

D.C., a 12-year-old neighbor, testified she was doing her homework when she heard Vest's daughter screaming at him outside. D.C. saw a man holding a knife chasing after another man.[3] She saw the first man throw the knife in the street. Although she did not identify Ferea as the man with the knife, she said the man with the knife knows her mom's brothers and had visited at her house earlier that day. He did not talk to her then, but he did say "Hi," to her brother.

### 3. San Jose Police Officer Thomas O'Donnell

Officer Thomas O'Donnell of the San Jose Police Department testified he interviewed D.C. on the afternoon of the incident. O'Donnell said he had some difficulty conducting the interview, as D.C.'s mother "did not want her to cooperate with me," and did not "want her daughter to get involved or give me any information as to what she had seen." D.C. told O'Donnell she was doing her homework when she heard glass breaking. She looked outside and saw Ferea standing across the street screaming, bleeding from his hands. He threw a knife across the street, then sat down on the lawn. Ferea was the only person she saw outside. She then saw the police arrive and start talking to him.

### 4. Kimberlee Kelley's testimony

Kimberlee Kelley testified that Ferea is the son of one of her best friends and, at the time of the incident, she was renting a room to Ferea and his wife, Andrea. Kelley lived in one of the other bedrooms, and shared the kitchen and living space with the Fereas.

---

[3] D.C.'s testimony was reluctant and she did not identify Ferea in court. She began to cry when shown a picture of the knife recovered from the scene.

4

On September 8, Kelley had returned from work and saw Ferea on Vest's[4] porch talking to someone. She waved and asked him to come over when he was finished talking. Kelley went inside, changed her clothes and ate. About an hour after she got home, she heard yelling outside. She saw Ferea in the front yard and she heard Andrea crying. Kelley went outside and asked Andrea what was wrong. Ferea and Vest were yelling and cursing at each other, saying things like "bring it on." Kelley also may have told a defense investigator she heard Andrea say, "No Bill, No Bill, don't go over there." Kelley saw that Ferea's face was puffy and it looked like he had been in a fight. His face, mouth and hands were bloody.

Kelley, Ferea and Andrea went inside their house. Ferea was drunk and was asking Kelley for the telephone. He was unsteady and bounced into the walls in the hallway, knocking a picture off the wall and some knick-knacks off a wall unit. She asked him what was going on and he said, "We got in a mother-fucking fight." She told him to go in the bathroom so they could clean him up.

Kelley then heard a "boom" at the door, though she does not know what caused the noise. Ferea stepped out onto the porch, and Kelley could see Vest outside on the sidewalk, armed with a knife. Vest gestured at Ferea with the knife, challenging him. Ferea went into the kitchen and grabbed a knife[5] from the butcher block and returned outside to confront Vest. Kelley told him to stay inside, but he ignored her. She called 911, and as she took the phone into the front yard, she saw Ferea running around the corner where she lost sight of him for a period of time.

_____

[4] Kelley testified that she did not know Vest's real name at the time, and instead always referred to him as "Mr. Asshole." She did not want to testify because Vest was vindictive and, as she still lived next door to him, she was afraid.

[5] When shown the knife found by police at the scene, Kelley was unable to say whether or not it came from her kitchen. She also could not recall if she told a defense investigator that Ferea grabbed a meat cleaver, as opposed to a "knife."

Ferea reappeared, still running and yelling, but without the knife. He sat down on the front porch where he and Kelley waited for the police to arrive. When the police arrived, they stood by their cars at first and asked what was going on. Kelley heard Ferea say, "Great, yeah, you mother fuckers are coming, just go ahead, take me to jail, I know I'm going there anyway." Ferea kept referring to the police as "mother fuckers" and was also telling Kelley to shut up, saying "You don't have to talk to them, you don't have to answer any their [*sic*] bullshit." She did not hear Ferea tell Andrea not to talk to the police. She also did not hear Ferea tell any of the officers that he would find them and kill them when he got out of jail. Kelley says she kept telling Ferea to be quiet because she did not allow such language in her house.

Kelley saw Ferea trying to stand up as the officers approached. Because he was bleeding profusely, he was spitting blood out of his mouth, some of which landed on one of the officers' shoes. At that point, Kelley saw four officers shove Ferea to the ground and put his face in the dirt before putting a spit mask over his head.

### 5. *Defense investigator Douglas Coffey*

Douglas Coffey testified he interviewed Kelley on October 19, 2010. She told Coffey that on September 8, 2010, her evening routine had been interrupted when she heard Andrea outside screaming "at the top of her lungs 'No Bill, no Bill, don't go over there.' " Kelley went outside and saw Ferea, upset, drunk and shirtless, engaged in a confrontation with Vest. Ferea was not making any sense, but at one point, he told her he was going to "fuck that mother fucker up." Kelley saw Ferea return to her house and grab a meat cleaver from her kitchen. Kelley also told Coffey she overheard Ferea tell the responding police officers, "Go ahead and take me to jail. When I get out I'll find you and I will kill you."

### 6. *Other physical evidence*

Police retrieved a bloody meat cleaver on the street, less than half a block from where they arrested Ferea. They also found a blood trail leading from a vehicle with a

6

smashed windshield towards the front of Ferea's residence. There was a wooden block on the ground near this vehicle, but no bricks or other large, heavy objects.

### 7. *San Jose Police Officer John Terry*

When Officer John Terry and other officers arrived in response to Kelley's 911 call, they encountered Ferea sitting near his front porch. He did not have a shirt on, and was bleeding from his hands and mouth. Ferea appeared to be drunk[6] and he was confrontational and verbally abusive towards the officers. He cursed at them repeatedly, screaming "fuck you, pigs." He was also yelling at his wife, Andrea, telling her not to talk to the police.

Terry approached to within seven feet of Ferea, who was still sitting down, and asked him for his identification. Ferea refused to provide it, and said, "My identification is in my pocket and I dare you to come get it." As he said that, he stood up quickly, puffed out his chest and clenched his fists. Terry became concerned about his safety and the safety of the other officers, so he moved closer and tried to detain Ferea, who pulled away. Terry pulled Ferea's arm behind his back and took him down to the ground. With the help of other officers, he handcuffed Ferea.

Ferea continued to curse at the officers and tried to spit on one of them. Terry grabbed Ferea's hair and pushed his face into the grass. A spit mask was placed over Ferea's head. As fire department and emergency medical technicians moved in to try to render medical assistance to Ferea, he cursed at them as well, tried to spit at them and continued struggling, so officers held his legs down.

Ferea was transported to the hospital and Terry followed to continue his investigation. At the hospital, Ferea continued to be aggressive, cursing and trying to spit at the nurses who were attending him. Terry stood by, as he was concerned that Ferea,

---

[6] Ferea had a blood sample drawn at the hospital following his arrest and it was stipulated that his blood alcohol content measured 0.21 percent.

though still handcuffed, could harm the staff at the medical center. As Terry stood there, Ferea told him he would pull the police report, remember Terry's face and when he got out of prison he would find him and kill him. Specifically, Ferea said he would shoot Terry. Because Ferea articulated how he was going to discover Terry's name from the police report and remember his face, Terry considered this to be a genuine threat to his safety. Terry was still fearful at the time of trial because the police report had his name on it.

    8.  *Testimony regarding Ferea's prior violent encounters with police*[7]

  At approximately 2:10 a.m. on January 25, 2004, San Jose Police Sergeant Richard Delisser responded to a report of a family disturbance. Delisser was the first officer to arrive at the reported address, so he stood outside waiting for backup and made no effort to contact anyone inside the residence. As he stood there, Ferea opened the door and came out. Ferea was talking on a cordless phone with the police dispatcher. He made eye contact with Delisser and Delisser believed he appeared "hostile." Delisser heard a distressed female voice from the back of the residence, behind a closed door. The woman's voice was "loud and frantic." Delisser told Ferea why he was there, and Ferea told Delisser there "was no way we [i.e., police] were going to be coming into the apartment." Delisser then explained that he needed to contact the woman in the other room to make sure she was okay, but Ferea again said, "there was no way that we were going to be entering the apartment and that we would have to stay out of his house." During this exchange, Ferea was hostile and cursing at Delisser.

  Delisser entered the apartment to investigate, but Ferea stepped in front of him and attempted to block him. He told Delisser to "get out" and that he "was not allowed in the

---

   [7] This evidence was the subject of competing in limine motions brought by Ferea and the People. The court found it was admissible against Ferea under Evidence Code section 1101, subdivision (b), a ruling we discuss in detail below. Further statutory references are to the Evidence Code.

apartment." Ferea threw the cordless telephone at Delisser, hitting him just above the left eyebrow, saying "You ain't coming in here, bitch," and "Get the fuck out of my house." Delisser took Ferea down to the ground to try and control him, but Ferea kept punching Delisser in the torso. During the struggle, Ferea grabbed Delisser's radio mic from its shoulder clip, and threw it at Delisser's head, hitting him again above the left eyebrow. Another officer arrived and helped Delisser subdue and arrest Ferea, who continued to offer significant resistance. Delisser suffered a one-inch laceration over his eyebrow which required treatment at the emergency room.

On March 10, 2008, San Jose Police Detective Marco Ybarra and two other officers were dispatched to a 911 call. When they arrived at the scene, they found Ferea, wearing sweatpants but no shirt. There was blood on Ferea's clothing. Ferea was yelling at the officers and acting "very aggressive." Ferea's fists were clenched. Ybarra saw he was holding something in one hand but he could not identify what it was. A woman at the scene, subsequently identified as Ferea's mother, screamed to the officers that Ferea had a knife.

Ferea approached the officers, yelling profanities, and the officers moved off the sidewalk, out of his path. Ferea followed them into the street. One of the officers pulled out his gun, and Ybarra pulled out his Taser. The officers repeatedly directed Ferea, who was standing about 15 to 20 feet away, to drop the knife, but he did not comply. Instead, Ferea threw the knife at the officers. Ybarra dodged to his left, otherwise the knife would have hit him. The knife landed between Ybarra and another officer.

Ybarra yelled at Ferea, telling him multiple times to get on the ground, but Ferea refused to comply. Ferea responded, "Let's go, let's do this," again clenching his fists and adopting a fighting stance. Ybarra tasered him and Ferea was taken into custody. He was transported to the hospital, which is standard procedure when a suspect is tasered.

9

Ybarra also went to the hospital to continue his investigation. Ybarra read Ferea his *Miranda*[8] rights and asked Ferea if he understood them. Ferea responded, "Yes, mother-fucking [*sic*] cop, I understand my constitutional rights." When Ybarra asked Ferea if he wanted to give a statement, Ferea said, "Sure, why not. It's not the first time I assaulted an officer. It's not going to be the last time, either." Ferea told Ybarra the last time he assaulted an officer he only got a year in jail and some time working at the Salvation Army. Ferea threatened Ybarra, saying he knew the detective's name and badge number and "was going to come out and kill [him]." Ferea claimed he had the badge number and name of every officer at the scene, and "he was going to come back and kill everybody."

Ybarra also said Ferea asked why the officers did not kill him since he was armed with a knife. He said he was hoping one of the officers would shoot and kill him. Ybarra wrote in his report that Ferea was trying to commit "suicide by cop."

C. *Defense case*

Ferea's wife, Andrea, testified she came home late in the afternoon on September 8, 2010 and saw Vest, armed with a knife, chasing her husband. Ferea had a bloody nose and mouth, and his face was swollen. She got out of the car, and asked Ferea what was going on. She could smell alcohol on his breath and noticed he was stumbling and slurring his words. Vest ran down the alleyway between their two houses. Andrea went inside with her husband and she went to get a towel for him from the bathroom.

She heard pounding on the door and saw Kelley answer the door. Vest was outside the house, still armed with a knife. Vest was taunting Ferea. Ferea went outside, unarmed, and Andrea followed him. Ferea began to chase after Vest and, again, Andrea followed after the two. The chase ended near some cars parked down the street. Vest, joined by his nephew, began throwing bricks or blocks at Ferea. Ferea was hit in the

---

[8] *Miranda v. Arizona* (1966) 384 U.S. 436.

10

head by one and fell to the ground. As Andrea went to help Ferea up, Vest and the nephew threw more blocks at her, the last of which shattered the windshield of a car parked nearby. Andrea and Ferea returned to their porch, where they sat with Kelley waiting for the police to arrive. Andrea noticed that her husband's hands were also bleeding heavily.

The police arrived and Ferea stood up. When the police took out their tasers, Andrea asked them not to taser Ferea. The police pulled her aside, then took Ferea to the ground. She tried to watch what was going on, but the police told her to turn away and not look at her husband.

Andrea said she injured herself early that morning, after her feet got tangled in her bedsheets while getting out of bed. She fell against the night stand, suffering a bump on her forehead and a cut lip. Andrea, who was pregnant at the time, and Ferea drove to the emergency room for treatment. She denied that the injuries were caused by Ferea and said Ferea has never struck her.

As she was being interviewed by police, a gray-haired officer came up to her as she was talking to another officer. The gray-haired officer suggested Andrea was a victim of domestic violence and accused her of being a manipulator who would cover for her husband. After that, Andrea was upset and did not give a complete statement to the other officer who was interviewing her. She denied that Ferea was yelling at her not to talk to the police.

### D. *Verdict and sentencing*

The jury found Ferea guilty on the assault and criminal threat charges (counts 2 & 3), but found him not guilty of burglary (count 1). In a bifurcated proceeding, the court found true the allegations that Ferea had a prior strike conviction and a prior serious felony conviction.

11

The court denied Ferea's motion for a new trial. After denying his *Romero* motion, the trial court subsequently sentenced him to an aggregate term of 10 years, four months in prison.

## II.   DISCUSSION

### A.   *The trial court properly admitted evidence of Ferea's two prior encounters with police officers*

Ferea argues the trial court should have granted his in limine motion and excluded evidence of his two prior encounters with police. This evidence was initially offered to establish his motive and intent in relation to the charge of making a criminal threat but was later allowed to be considered as character evidence. However, Ferea contends the trial court erred in admitting this evidence because the incidents were not sufficiently similar to the charged offense to warrant admission under section 1101, subdivision (b) and the prejudicial impact of the evidence outweighed its probative value.

### 1.   *In limine ruling*

Prior to trial, the court heard argument on Ferea's motion to exclude evidence of his 2004 and 2008 encounters with police. The court denied the motion, stating the evidence in question "is perhaps some of the clearest evidence of the [defendant's] state of mind . . . , specifically of his specific intent that his words be taken as an unequivocal and unconditional threat. [¶] The statements made on the previous occasion were designed to give the officers notice that he had previously committed an assault on officers, that he receive[d] what he thought was a pittance of a sentence, implying that there was no motivation for him not to carry out those threats, and that if he did carry out those threats in the future the sentence would be unsubstantial in his view, are clearly designed to engender fear. [¶] And that clearly shows in conduct, albeit similar in this case, that the defendant's specific intent is to engender fear, and it is very unequivocal evidence of the defendant's motive, his animus against police officers. [¶] And for those reasons I do find that under [section] 1101[, subdivision] (b) this evidence is highly

relevant, perhaps some of the most relevant evidence that could be introduced in this case, and will answer questions that otherwise would obviously be present in the mind of the jury as to why the defendant would commit seemingly unprovoked and over-the-top reactions to the simple arrest that occurred in this case. [¶] So for all of those reasons I do find that in balance this evidence is not unduly prejudicial, it is highly probative, and it will be allowed."

### 2. *The evidence was admissible under sections 1101 and 1103*

Character evidence in the form of specific instances of a person's conduct is inadmissible when offered to prove the person's conduct on a specific occasion. (§ 1101, subd. (a).) This prohibition, however, does not apply if the evidence is relevant to prove some fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident, other than the person's disposition to commit the act. (*Id*., subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) On appeal, the trial court's determination of whether to admit prior conduct evidence under section 1101, "being essentially a determination of relevance, is reviewed for abuse of discretion. [Citations.] [¶] . . . [¶] . . . A court abuses its discretion when its ruling 'falls outside the bounds of reason.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 369, 371.)

In *Ewoldt*, *supra*, 7 Cal.4th 380, the California Supreme Court held that the least degree of similarity between the uncharged act and the charged offense is required in order to prove intent. However, an uncharged act "must be sufficiently similar to [the charged offense] to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Id*. at p. 402.)

Under section 1103, where the defendant offers evidence which puts at issue the victim's violent character, evidence of the defendant's violent character becomes relevant. Section 1103 expressly removes limits that would otherwise be placed on the evidence by section 1101. (See § 1103, subd. (b).)

13

The trial court did not abuse its discretion in admitting testimony regarding Ferea's 2004 and 2008 encounters with police. In both instances, Ferea demonstrated his animosity toward police officers. In the 2008 incident, Ferea explicitly threatened to kill the responding officers and even threw a knife at them, while in the 2004 incident, Ferea attacked an officer who was trying to check on the welfare of a person the officer heard crying out inside Ferea's residence. In the instant case, Ferea threatened to kill a police officer using language similar to that used in the prior knife-throwing incident. The evidence was offered to establish that when Ferea threatened Terry at the hospital, he did so with the same intent as in the prior incidents. It showed his conduct was motivated by a demonstrated hatred of police officers, and as the court recognized, it offered the jurors insight into Ferea's behavior. The evidence was relevant and admissible under section 1101.

Furthermore, once Ferea elicited testimony regarding Vest's violent character, his own violent character was put at issue pursuant to section 1103, subdivision (b). Ferea offered evidence to show it was Vest who was armed and who came over to challenge him to a knife fight after their initial verbal altercation. On cross-examination by Ferea's counsel, Kelley testified she was afraid Vest would retaliate against her for testifying about the fight. At that point, the People were permitted to respond with evidence showing Ferea's character for violence. (See *People v. Blanco* (1992) 10 Cal.App.4th 1167, 1171-1176.)

> 3.    *The evidence was admissible under section 352*

Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "[I]t is the exclusive province of the trial court to determine whether the probative value of evidence outweighs its possible prejudicial effect." (*People v. Sassounian* (1986) 182 Cal.App.3d

14

361, 402.) Evidence of uncharged offenses can be so prejudicial that its admission requires extremely careful analysis and, since substantial prejudicial effect is inherent in such evidence, uncharged offenses are admissible only if they have substantial probative value. (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.) Regardless, the trial court's exercise of discretion on this issue will not be disturbed on appeal absent a clear showing of abuse. (*People v. Sassounian*, *supra*, at p. 402.) No such showing has been made here.

The testimony offered in this case regarding the uncharged offenses was brief, not likely to confuse the jury, nor was it unduly prejudicial when compared to the evidence presented regarding the charged offenses. The two witnesses, Kelley and Andrea, who gave the most favorable testimony for Ferea, both confirmed that Ferea was drunk and (at least somewhat) belligerent. They also testified Ferea had been involved in some type of confrontation with Vest, though they maintained Vest was the instigator. However, Kelley testified Ferea cursed repeatedly at the police. Ferea's counsel even conceded in final argument that Ferea made the threat against Terry, but argued that it could not have been taken seriously because Ferea was so drunk when he made it. The trial court did not err in finding that the evidence of Ferea's 2004 and 2008 encounters with police was not substantially more prejudicial than probative under section 352.

We do not think our opinion in *People v. Earle* (2009) 172 Cal.App.4th 372, compels a different result. In *Earle*, the trial court consolidated for trial two separate cases against the defendant--one for misdemeanor indecent exposure in September 2004, and a second for felony sexual assault in December 2004. (*Id*. at p. 380.) Although the two charges arose from "entirely distinct and dissimilar incidents with no apparent historical connection to one another," the trial court denied the defendant's motion to sever the matters for trial. (*Id*. at p. 378.) After the defendant was convicted on both charges, this court reversed because the evidence proving his indecent exposure charge would not have been admissible in a separate trial on the sexual assault charge, and the trial court should have granted the motion to sever. (*Id*. at p. 379.)

15

Unlike *Earle*, this case involved a contiguous series of events, beginning with the altercation between Ferea and Vest and culminating in Ferea's threat to kill Terry. There was never an issue regarding severance of the charges against Ferea and the evidence of Ferea's prior encounters with police involved similar unprovoked violence and abusive language. Unlike *Earle*, this case does not present different types of conduct (e.g., indecent exposure versus sexual assault) for which separate intents may or may not have been present.

4. *Assuming the evidence should have been excluded, any error was harmless*

Regardless, any error in admitting the evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Scott* (2011) 52 Cal.4th 452, 492 [employing *Watson* analysis where evidence erroneously admitted under § 1101].) The evidence against Ferea was strong and much of it was corroborated by other witnesses, including witnesses who gave otherwise favorable testimony. All the witnesses said Ferea was drunk and everyone but Andrea testified Ferea was cursing at and belligerent towards the police. The officers testified Ferea was urging witnesses, including his wife, not to speak to police, and even Kelley admitted Ferea told her she did not have to talk to the officers. After he was incarcerated and Vest was in custody in the same facility, Ferea attempted to persuade Vest to testify in his favor. Ferea's counsel essentially admitted Ferea threatened to kill Terry, but argued the threat could not have been taken seriously, given Ferea's level of intoxication. Even had the jury not heard the testimony regarding Ferea's two prior violent encounters with police, it is not reasonably likely they would have found him not guilty of making a criminal threat toward Terry.

B.      *No error in excluding certain impeachment evidence related to Vest*

Ferea contends the trial court erred in excluding evidence of eight crimes committed by Vest between 1987 and 1995. At least five of these crimes involved theft and one was for extortion. Although the court admitted several of Vest's priors dating

16

from 2005 for the purposes of impeachment as moral turpitude offenses, it should have allowed Ferea to impeach him further with the 1987 to 1995 convictions.

### 1. *In limine ruling*

The People brought a motion in limine to preclude evidence of moral turpitude crimes committed by Vest prior to 1997. After hearing argument from both sides, the trial court granted the motion, finding that Vest had committed no theft-related or other crimes of moral turpitude since 1996, and his convictions since 2005 have all been domestic violence related charges. At trial, Vest admitted the following offenses: (1) a 2010 conviction for violation of a stay-away order, for which he was then serving a six-month sentence; (2) a 2010 conviction for corporal punishment of a child; (3) a 2005 conviction for violating a restraining order; and (4) a 2005 conviction for harassing telephone calls. The parties stipulated Vest was convicted of misdemeanor battery in 1990, misdemeanor infliction of corporal injury to a spouse in 1996 and felony infliction of corporal injury on his spouse in 1995.

### 2. *Standard of review*

"As with all relevant evidence, . . . the trial court retains discretion to admit or exclude evidence offered for impeachment. [Citations.] A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) When exercising its discretion under section 352 to bar impeachment with prior conduct, a trial court should "be guided--but not bound--by the factors set forth in *People v. Beagle* (1972) 6 Cal.3d 441, and its progeny. [Citations.] When the witness subject to impeachment is not the defendant, those factors prominently include whether the [conduct] (1) reflects on honesty and (2) is near in time." (*People v. Clair* (1992) 2 Cal.4th 629, 654.)

### 3. *No abuse of discretion in limiting impeachment evidence*

The court, after hearing argument from both sides, granted the People's motion to preclude evidence of Vest's pre-1997 convictions. The record shows the court was aware that many or most of these earlier offenses were theft-related and acknowledged they would therefore be relevant to gauging Vest's credibility. However, the court was also cognizant that there was a nine-year period of time (i.e., between 1996 and 2005) where Vest had *no* criminal convictions, and from 2005 on, none of his criminal offenses was theft-related. On that basis, the court determined the pre-1997 convictions were much less probative for impeachment purposes. We cannot say, on this record, the trial court's decision was arbitrary, capricious, or "patently absurd." (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 9.)

The trial court's decision to preclude this evidence also did not violate Ferea's Sixth Amendment right to effective confrontation of adverse witnesses.[9] Despite not being able to impeach Vest with his pre-1997 convictions, the jury did hear about Vest's multiple domestic violence related convictions dating back to 2005, and knew that Vest was incarcerated due to one of those convictions at the time he testified. The jury was also aware that at least one of the witnesses, Kelley, was afraid of Vest and specifically feared he would retaliate against her in some way for testifying at trial.

Based on the verdict, the jury appears to have discredited Vest's uncorroborated testimony relating to the first degree burglary charge since it acquitted Ferea on that particular count. Though it convicted Ferea on the charge of assaulting Vest, the jury heard testimony from witnesses other than Vest about that incident, such as Kelley, who

---

[9] The People contend Ferea has forfeited this issue by failing to object on this ground below. Assuming without deciding the argument is forfeited, we address it nonetheless in order to preclude it being later raised in the context of an ineffective assistance of counsel claim. (See *People v. Williams* (1998) 61 Cal.App.4th 649, 657 [addressing the merits of a claim, despite its forfeiture, to preclude ineffective assistance of counsel claim].)

testified she saw Ferea arm himself with a knife before going outside and chasing after Vest. Precluding Ferea from further impeaching Vest with his pre-1997 convictions did not violate Ferea's Sixth Amendment rights.

### C. *No error in allowing questions and evidence regarding Andrea's injuries*

Ferea contends the trial court abused its discretion in permitting the prosecutor to ask Andrea about the cause of fresh bruises observed on her face on the day of the incident.

#### 1. *In limine motion*

The court granted Ferea's in limine motion precluding the People from referencing officers' suspicions Andrea was the victim of domestic violence. However, the court ruled that, if Andrea were called as a defense witness, the People had a good faith basis for asking her about the facial injuries she had on the day of the incident.

#### 2. *Standard of review and analysis*

A court has broad discretion to admit evidence of bias and motive under section 352. A trial court's discretionary decision to admit or exclude evidence " ' "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 585; *People v. Brown* (2003) 31 Cal.4th 518, 534.)

The court has discretion to admit evidence showing that a witness is afraid for her safety if she testifies. (*People v. Abel* (2012) 53 Cal.4th 891, 924-925; see § 780.) As we have recognized, " '[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court.' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

19

The jury was shown a photograph taken of Andrea's injuries on the day of her husband's arrest and heard her testimony about those injuries being caused by her getting caught in the bedsheets that morning and falling into the nightstand. The jury also heard her deny that the injuries were caused by Ferea hitting her and heard her explain she stopped talking to police only after one of the officers said she was a victim of domestic violence and thus not credible.

On the other hand, one of the police officers testified Ferea was aggressively yelling at Kelley *and* Andrea, telling them not to cooperate. Kelley denied this, saying Ferea did not yell at her, but rather *told* her she did not have to talk to police. Kelley also denied Ferea said anything to Andrea. Given that there was some, albeit conflicting, evidence Ferea was trying to convince his wife not to cooperate with police at the scene, the court did not abuse its discretion by allowing the prosecutor to question her about the source of her injuries.

Even assuming this was error, however, the error was harmless. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Andrea denied the prosecutor's accusations that Ferea may have hit her that morning, and she offered her own explanation for her injuries. The jury was free to decide which version was more likely and weigh the credibility of her other testimony accordingly. Regardless, there was no dispute that Ferea was very drunk that day and abusive towards both police officers and Vest. There is no dispute that Ferea threatened to kill at least one of the responding officers. Although Andrea was the only contemporaneous witness who denied Ferea was armed, even she testified that Ferea chased after Vest.

D.     *No cumulative error*

Since we have found no error with respect to any of the evidentiary claims Ferea raised, and no prejudice even if error were shown, there is no basis for finding that reversal is warranted due to any cumulative error.

*E.      Sufficiency of evidence supporting conviction on criminal threat*

Ferea next argues that his statements to Terry were not, under the circumstances, sufficient to convey the necessary "immediate prospect of execution of the threat" to establish a violation of Penal Code section 422, subdivision (a).  Given his level of intoxication and the lack of evidence that Ferea would somehow be able to remember Terry or track him down when he eventually got out of custody, the evidence was insufficient to support his conviction for making a criminal threat.

*1.      Standard of review and statutory overview*

To prove the crime of criminal threat, the prosecution must prove, among other things, that the threat caused the victim to be in sustained fear for his or her own safety or for his or her immediate family's safety and that the fear was reasonable under the circumstances.  (Pen. Code, § 422; *People v. Toledo* (2001) 26 Cal.4th 221, 228.)

"In order to sustain a finding that appellant made a terrorist threat in violation of [Penal Code] section 422, the People [are] required to show:  (1) appellant willfully threatened to commit a crime that would result in death or great bodily injury; (2) he made the threat with the specific intent that it be taken as a threat; (3) the threat, on its face and under the circumstances in which it was made, was so unequivocal, unconditional, immediate and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; and (4) the threat caused the person threatened reasonably to be in sustained fear for his own safety [or for his immediate family's safety]."  (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1136; Pen. Code, § 422.)  "In reviewing the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (*People v. Davis* (1995) 10 Cal.4th 463, 509.)  " 'In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce

21

from the evidence in support of the judgment.  The test is whether substantial evidence supports the [conclusion of the trier of fact], not whether the evidence proves guilt beyond a reasonable doubt.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.)

       *2. Sufficient evidence supported the conviction for making a criminal threat*

Ferea argues the circumstances surrounding his threat "failed to convey an immediate prospect of execution."  He was very drunk, had just been arrested and would likely be given a lengthy prison term for his offenses.  There was no reason to believe he could actually track down one police officer based on a name in a police report.  Citing the dissenting opinion in *People v. Wilson* (2010) 186 Cal.App.4th 789, 823 (*Wilson*), Ferea argues that his threat to kill Terry "when he got out of prison" did not convey the necessary "immediate prospect of execution of the threat."  We disagree.

In *Wilson, supra*, 186 Cal.App.4th 789, the defendant was serving a state prison sentence and scheduled to be released in approximately 10 months when he threatened a correctional officer who was escorting him to a " 'cooling off' " cell.  (*Id*. at pp. 797-798.)  The defendant " 'started talking about killing officers, claiming that he had done it before.' " (*Id*. at p. 797, italics removed.)  He looked over at one of the officers and stated, " ' "I can find anybody and blast them.  That's what I do." ' " (*Id*. at p. 798, italics removed.)  The defendant continued, " 'I get out in ten months.  I find people.  That's what I do, and I'm going to find you, and I'm going to blast you.' " (*Ibid*., italics removed.)

In the majority opinion, the court found substantial evidence supported defendant's conviction under Penal Code section 422.  In examining the third element of that statute, which requires that there be " ' "an immediate prospect of execution of the threat," ' " the court determined this language " 'does not require an immediate ability to carry out the threat.' " (*Wilson, supra*, 186 Cal.App.4th at p. 807.)  The court rejected the defendant's arguments that he could not " 'do anything for at least ten months' " and that

there was "no evidence he had the ability to 'find' " the victim. (*Id*. at p. 816.) The court found that the statute's requirement that there be an " 'immediate prospect' " of the threat's execution was not "intended to place a limited timeline on when a specific and unconditional threat would be executed." (*Ibid*.) The threats against the correctional officer "satisfied this element of [Penal Code] section 422 because [they] were extremely specific and based only upon the 'condition' and certainty of his upcoming release." (*Id*. at pp. 816-817.) The defendant "effectively made an appointment to kill [the correctional officer] at his earliest possible opportunity . . . ." (*Id.* at p. 814.)

In this case, Ferea's threat was not vague or ambiguous. At the hospital, he told Terry that when he got out of prison, he was going to use the information in the police report to find and kill him. Ferea even specified the manner in which he would kill Terry, i.e., that he would shoot him. The only condition to Ferea's threat was that it would be carried out after Ferea "got out of prison." There was nothing in the circumstances of the statement that suggested he was joking, or simply rambling because he was drunk and angry at being arrested.

Ferea makes much of his claim that Terry could not have been genuinely fearful since Ferea was about to be incarcerated for some length of time. However, there is no evidence in the record to establish that Terry could have any idea how long Ferea might be in custody. As far as Terry knew, Ferea could be out on bail in a few hours. At the time Ferea threatened Terry, there were any number of possible outcomes to the case, not all of which would result in Ferea going to jail, let alone prison. The district attorney might decide not to prosecute Ferea or perhaps Ferea would be able to negotiate a plea bargain and be released on probation. Regardless, numerous cases have upheld such threats even where the defendant was actually incarcerated and utterly incapable of (directly) harming the victim at the time the threats were made. (See, e.g., *Wilson*, *supra*, 186 Cal.App.4th 789 [criminal threat conviction upheld despite defendant in custody for at least 10 more months]; *People v. Mosley* (2007) 155 Cal.App.4th 313 [incarcerated

23

defendant threatened to obtain and pass along officer's contact information to gang associates who would kill officer and rape his wife]; *People v. Gaut* (2002) 95 Cal.App.4th 1425 [incarcerated defendant called girlfriend from jailhouse phone and told her she would die].) We agree with the rationale set forth by the majority in *Wilson*, and find there was substantial evidence presented here to support the jury's verdict on the charge of making a criminal threat.

F.   *The trial court did not abuse its discretion in denying an evidentiary hearing on Ferea's motion for new trial*

1.   *Background*

At trial, following the testimony by D.C.--who refused to identify Ferea in court-- and O'Donnell--who recounted his interview of D.C. at the scene that day where she did identify Ferea as the person she saw with a knife--a juror sent a note[10] to the judge, asking "Can we look at and take into account the defendant's body language while the witnesses are being questioned?"

Outside the jury's presence, the court invited counsel to address the question. Ferea's counsel said, "although I hate to concede anything, I would have to say the answer to [the juror's] question is, yes, they can consider it." The court advised it intended to respond to the note "by informing the jurors that they will be given a complete set of instructions on evaluating evidence at the conclusion of the proceedings, that it is important that they focus on the witnesses as they testify and the witness's demeanor as they testify so that they are able to evaluate for themselves that witness's testimony." The court also indicated it believed the issue would have to be addressed in the jury instructions and asked counsel to prepare proposed instructions to that end.

---

[10] The note itself is not contained in the clerk's transcript.

After the jury returned, however, the court did not respond to the note or even acknowledge its receipt. No specific instructions were provided by counsel and the matter was apparently forgotten by everyone involved.

Following Ferea's conviction, new counsel was appointed, who filed a motion for a new trial based on the court's failure to address the juror's question. Accordingly, one or more jurors may have improperly considered Ferea's demeanor during trial in evaluating his case. The motion was supported by a declaration from Ferea's trial counsel who admitted he forgot to follow up on this matter during the trial. Ferea's trial counsel also asserted that he had to "repeatedly remind[]" Ferea to behave appropriately during the trial since Ferea "had used foul language and physical intimidation in his dealings with me, both at Elmwood and in the trial department." According to trial counsel, "Ferea continued to act in an inappropriate manner during the trial process; [¶] . . . used inappropriate language and made facial gestures in the presence of prospective jurors; [¶] [and] . . . initially refused to wear civilian clothing for trial and appeared before the jury in his jail garb."

The trial court denied the motion without an evidentiary hearing. In announcing its ruling, the court noted that Ferea did not engage in "disruptive behavior or otherwise inappropriate behavior . . . when the jurors were present" nor did he use inappropriate language in front of the jurors. The court acknowledged it "may be true" that Ferea made "facial gestures in the presence of prospective jurors." Despite the court's failure to respond to the juror's question, it did instruct the jury at the close of trial "the only things they were to consider was the evidence produced during the trial and that . . . evidence meant testimony of the witnesses, physical exhibits introduced during the course of the trial and anything else I specifically told them to consider as evidence."

2.      *Relevant legal principles and standard of review*

It is well-settled that the decision to conduct an evidentiary hearing on allegations of juror misconduct is within the trial court's discretion and the defendant is not entitled

25

to such a hearing as a matter of right. (*People v. Avila* (2006) 38 Cal.4th 491, 604.) An evidentiary hearing should only be held where " 'necessary to resolve material, disputed issues of fact,' " and where " 'the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.' " (*Ibid.*) Even then, " 'an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*Ibid.*)

Accordingly, the trial court's denial of a request for an evidentiary hearing into allegations of jury misconduct is reviewed for abuse of discretion. (*People v. Avila*, *supra*, 38 Cal.4th at p. 604.)

### 3. *Analysis*

We first dispose of the People's contention that Ferea has either forfeited this claim by failing to object below or invited the error by conceding that it was permissible for the jurors to consider Ferea's body language as witnesses were testifying. Assuming without deciding the argument is forfeited, we address it nonetheless because Ferea has also claimed that his trial counsel provided ineffective assistance of counsel in this regard. (See *People v. Williams*, *supra*, 61 Cal.App.4th at p. 657 [addressing the merits of a claim, despite its forfeiture, to preclude ineffective assistance of counsel claim].)

Turning to the merits of his claim, we find the trial court did not abuse its discretion in denying his motion for new trial without first holding an evidentiary hearing. Ferea did not present the necessary evidence showing a "strong possibility" that juror misconduct occurred. The sum of the evidence presented to the trial court in connection with the motion for new trial consisted of: (1) the reporter's transcript[11] reflecting the juror's question; and (2) a declaration from trial counsel describing how Ferea "had used foul language and physical intimidation in his dealings with me, both at

_____

[11] As discussed above, the juror's note was apparently misplaced as it does not appear in the record.

Elmwood and in the trial department[;] [¶] . . . [¶] used inappropriate language and made facial gestures in the presence of prospective jurors; [¶] [and] . . . initially refused to wear civilian clothing for trial and appeared before the jury in his jail garb."

The juror's question, in and of itself, does not demonstrate a "strong possibility" misconduct occurred. The note was submitted during trial. Prior to deliberations, the trial court again specifically instructed the jury what it could consider as evidence. Those instructions made clear evidence consisted of the witnesses' sworn testimony, exhibits admitted into evidence as well as anything else the trial court told the jurors to consider as evidence. The jurors were also instructed that they could consider the *witnesses*' behavior while testifying. At no time during deliberations were any additional notes sent out asking if the jurors could consider Ferea's body language as evidence. Because the juror's question was submitted following the testimony of D.C., who appeared to be frightened of testifying and refused to identify Ferea in court as the man she saw armed with a knife that day, it raises a possibility something Ferea did during D.C.'s testimony caught this particular juror's eye. Without more, though, this note does not constitute a "strong possibility" of misconduct.

The declaration by Ferea's trial counsel fails to corroborate the possibility of misconduct. All trial counsel's declaration says is that Ferea acted inappropriately in the presence of "prospective jurors," not that he acted inappropriately or appeared hostile toward witnesses in front of impaneled jurors. The declaration also makes clear the "foul language and physical intimidation" was directed towards *trial counsel*, not witnesses, other court personnel or jurors. Trial counsel's declaration does not assert Ferea acted this way in front of any jurors, prospective or impaneled. Instead, Ferea was cursing at and trying to intimidate trial counsel at Elmwood and "in the trial department."

The trial judge, who was present at voir dire and at trial, specifically disclaimed having witnessed any aggressive or hostile behavior by Ferea. According to the judge, "I saw no disruptive behavior or otherwise inappropriate behavior on the part of the

27

defendant when the jurors were present" and there was no inappropriate or foul language "in the presence of the jury at any point in time during this trial." Had that occurred, the judge would have admonished Ferea "on the record." She acknowledged Ferea may have made "facial gestures in the presence of prospective jurors."

As he did below, Ferea relies principally on *People v. Garcia* (1984) 160 Cal.App.3d 82, 92 (*Garcia*), for the proposition that "the nontestimonial behavior of a defendant while in the courtroom cannot be judicially endorsed as evidence of his guilt." While this is an accurate citation, *Garcia* is not as helpful as Ferea contends, nor does it obtain to the facts of this case.

In *Garcia*, two jurors approached the trial judge after court had been dismissed for the day, and the judge consulted with them ex parte. (*Garcia*, *supra*, 160 Cal.App.3d at p. 87.) The jurors complained that, during the testimony of the last witness, they had observed the defendant turn to a woman sitting in the front row of the audience and the two would " 'jeer' " or smirk at each other, and they wanted the judge to instruct them to stop doing so. (*Ibid*.) The judge advised them to disregard what anyone in the audience was doing, that it was not evidence and they must base their decision in the case only on the legal evidence produced in the case. (*Ibid*.) After the jurors left his chambers, the judge located counsel informed them what had happened and admonished the defendant not to turn toward the audience. (*Ibid*.)

On appeal, the court made clear that it did not "entirely share" (*Garcia*, *supra*, 160 Cal.App.3d at p. 91) the trial court's view that a "defendant's courtroom demeanor could properly be considered by the jury in their evaluation of his guilt or innocence." (*Id*. at p. 90.) The court warned that "focusing the jurors' attention on a defendant's courtroom conduct distracts their attention from and may diminish the weight they assign to the permissible factors identified by the instructions as legitimately aiding in the determination whether the defendant committed the alleged offense." (*Id*. at p. 91.)

28

Here, however, there was no judicial endorsement[12] of Ferea's nontestimonial behavior. The juror in this case only asked if the jury could consider Ferea's "body language" while witnesses were testifying. The juror did not specify what he or she observed. While we may infer that the juror asked the question because Ferea's body language was intimidating or otherwise negative, there is no other evidence to buttress that inference. The declaration from Ferea's trial counsel does not state that Ferea was acting inappropriately in front of any of the impaneled jury members. The evidence presented to the trial court in connection with the motion for new trial may have raised a possibility that a juror improperly considered Ferea's courtroom demeanor, but it did not raise a "strong possibility" of such an occurrence. Accordingly, the trial court did not err in not holding an evidentiary hearing before denying the motion for new trial.[13]

Because there was no error by the trial court, the failure to request an evidentiary hearing did not constitute ineffective assistance of counsel. (See *People v. Price* (1991) 1 Cal.4th 324, 387 [failure to make unmeritorious motion or request is not ineffective assistance of counsel].)

---

[12] Nor was there judicial repudiation, but as the *Garcia* court observed, "[a] strong argument can be made that such an admonition [i.e., admonishing a jury to ignore a defendant's courtroom behavior in its deliberations] does little to dispel prejudice and only serves to emphasize an unruly defendant's conduct." (*Garcia*, *supra*, 160 Cal.App.3d at p. 93, fn. 11.)

[13] In a supplemental brief, Ferea argues "to the extent that the jury's verdict rested on an assessment of his demeanor," the verdict violated his rights under the due process and self-incrimination clauses of the Fifth Amendment, as well as the due process clause of the Fourteenth Amendment. Because Ferea did not make the necessary showing giving rise to an evidentiary hearing on the issue of juror misconduct, however, there is no basis for presuming that the verdict rests on the jurors' assessment of his demeanor. The trial court was not required to hold an evidentiary hearing on the basis of a supposition and its denial of his motion for new trial did not violate Ferea's constitutional rights.

**III.    DISPOSITION**

The judgment is affirmed.

_____

                              Premo, J.

WE CONCUR:

_____

        Rushing, P.J.

_____

        Elia, J.

30